**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| W&T OFFSHORE, INC. | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action No. 4:22-cv-3149 |
| v. | ) | |
| | ) | |
| ALL ABOUT IT, INC.; | ) | **Jury Trial Demanded** |
| SECURE CLOUD, LLC | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**W&T OFFSHORE, INC.'S REQUEST FOR AN EMERGENCY HEARING AND**
**EMERGENCY APPLICATION FOR EXTENSION OF**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION AND**
**REQUEST FOR PROTECTIVE ORDER**

1.      A notice of removal was filed to this Court two days before: (1) the expiration the state court's temporary restraining order enjoining All About IT, Inc. ("AAIT") and Secure Cloud, LLC (together, "Defendants") from carrying out their threat to abruptly cease providing IT services to W&T Offshore, Inc. ("W&T"); and (2) a scheduled hearing on W&T's request for a temporary injunction,.  Defendants' gamesmanship is intended to hold Plaintiff for ransom - - - putting the seamless operation of 117 operating platforms and more than 500 oil wells in the Gulf of Mexico at risk.    W&T seeks emergency relief in the form of an extension of the existing temporary restraining order in order to maintain the *status quo* until the Court can rule on a temporary injunction hearing.  Without this relief, W&T's temporary injunction will lapse without W&T ever having a temporary injunction hearing.

4

## FACTUAL AND PROCEDURAL BACKGROUND[1]

2.      W&T is publicly traded and has been active in the Gulf of Mexico as an oil and natural gas exploration and production company for more than 35 years.  W&T operates exclusively on state and federal offshore leases, and the United States government is one of W&T's largest royalty owners.

3.      Several years ago, Defendants AAIT and Secure Cloud began providing information technology ("IT") services to W&T.  Among other things, Defendants help maintain and operate certain of W&T's IT systems, including systems for using and storing W&T's emails and other electronic data (the "Systems and Electronic Data").  In essence, Defendants have functioned as W&T's de facto IT Department.  Indeed, AAIT's principal owner held himself out as an employee and de facto chief information officer of W&T until recently.  By necessity, that included maintenance and operation of W&T's systems that store valuable trade secrets, as defined below, which Defendants agreed to keep confidential.

4.      W&T recently hired a Chief Information Officer ("CIO").  The CIO initiated a fulsome review of W&T's IT systems and began to transition them back to internal resources at the company.  In the course of his review, the CIO requested information that should be readily available to any IT provider and expressed dissatisfaction with Defendants' responses.  Defendants soon recognized W&T's unhappiness with their performance.  After 4 years of performance by the Parties and more than $13 million in fees paid by W&T to AAIT, including $90,000 per month, on August 3, 2022, without prompting from W&T, AAIT sent W&T a letter purporting to terminate its contract with W&T.  But AAIT recognized that it could not simply walk away from

---

[1]      The facts in this Section A-D, inclusive, are taken from W&T's Verified Original Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction.  (Dkt. 1-1 at 8-19.)

W&T and that the parties "must work together to ensure that each respective party's assets are handled and transferred appropriately."  In particular, AAIT understood that the parties should "discuss cancelling the contract, an orderly removal of AAIT's equipment and software from all W&T platforms and systems, and the immediate transition of IT services to another provider."

5.      Shortly after their August 3, 2022 letter, AAIT stopped facilitating the orderly transition.  W&T has made significant progress in preparing to transition its IT function to in-house and third party providers.  But Defendants are delaying providing W&T with the basic information that W&T already paid for and needs to effect an orderly transition.  Defendants' intransigence is creating an imminent risk that W&T's operations will be delayed or interrupted. The potential consequences of Defendants' conduct include loss, damage to, or unavailability of trade secret and other digital information, through Defendants refusing to take steps to support the return of W&T's Systems and Electronic Data.  Accordingly, W&T requests that the Court enter a temporary restraining order, temporary injunction, and permanent injunction compelling Defendants and their owners, employees, representatives, and agents to:

- Preserve all W&T data and any related software and files except with the prior written consent of W&T and refrain from using or disclosing W&T's trade secrets;

- Provide physical access to leased spaces where W&T hardware, software, and operations are maintained at the data centers located at (a) 5150 Westway Park Blvd., Houston, Texas 77041 (the "Houston Data Center") and (b) 7301 Metropolis, Austin, TX 78744 (the "Austin Data Centers" and collectively with the Houston Data Center the ("Data Centers"), to facilitate physical access to all hardware owned or used by or for W&T or that contain W&T data and W&T's removal of any hardware that it owns from the Data Centers;

- Provide administrative credentials to all hardware and software owned, leased, or licensed by or for W&T, including the VMWare Hypervisor and each of the applicable virtual machines;

- Provide a thorough configuration of W&T's Cisco Call Manager, compilation of all W&T's Direct Inward Dialing (DID) phone numbers, and compilation of all W&T's Session Initiation Protocol (SIP) addresses;

- Provide administrative credentials for Dish Network, Lumen, Palo Alto, and any other providers of communication services provided to W&T, including at W&T offshore platforms and W&T offices; and

- Work with W&T to transfer the accounts and/or contracts for all vendors, services providers, and technology providers/licensors providing services and/or technology to W&T, including the Internet aforementioned circuit providers, Microsoft, Citrix, and VMWare; and

- Comply with its contractual obligation to cooperate with W&T to provide the same historic services and to facilitate an orderly transition of all IT services to another IT provider or to W&T to handle internally.

**A.     W&T developed valuable trade secrets in exploration, development, and acquisition of oil and natural gas.**

6.     W&T has expended significant resources developing and investing in proprietary trade secret technology in all facets of its operations.  W&T holds trade secrets across several disciplines, from geology to engineering, including but not limited to: (i) confidential and proprietary seismic data that W&T assembled, processed, and interpreted; (ii) drilling plans, drilling locations, hydrocarbon deposits, and the economic value of same; and (iii) confidential and proprietary information concerning reserves, decline rates, and well information (the "Trade Secrets").  W&T's Trade Secrets span selecting prospects and ongoing drilling activities, including seismic predictors and 3D seismic data.  This technology, in part, significantly reduced drilling risk and increases drilling success rate.

7.     Defendants have acknowledged their confidentiality obligations with respect to W&T's Trade Secret information.  As one of many examples, AAIT's principal Ramesh Arumugam, as an employee of AAIT, signed an agreement with W&T that includes a confidentiality provision.

> a. During the term of the Contractor Agreement, it may be necessary for Company to make available to Contract Worker, or Contract Worker may become exposed to, Company's technical, geological, geophysical, operational, production or business information, as well as third party confidential information licensed or otherwise provided to Company under terms of confidentiality between the Company and the third party (collectively, "Confidential Information"), whether disseminated orally, in writing, or through observation.  Contract Worker shall treat all Confidential Information as confidential property and shall not disclose, communicate, publish, or cause to be disclosed, communicated or published, any of said Confidential Information to any person, firm, or corporation during or subsequent to the term of the Contractor Agreement.  Excluded from the Confidential

8.      That agreement also acknowledges that W&T is entitled to injunctive relief and that

Arumugam's failure to comply with his obligations may cause irreparable harm to W&T.

> Company and Contract Worker agree that because the rights of Company hereunder are unique, any failure of Contract Worker to perform and comply with Contract Worker's obligations under this Agreement may cause irreparable harm and injury for which remedies at law may be inadequate. Accordingly, Company shall be entitled to injunctive or other equitable relief as a remedy for any such breach.  Contract Worker further agrees to waive any requirement that Company secure or post a bond in connection with such remedy.

9.      Additional agreements signed by Defendants' employees restrict access to

corporate data, and specify that Defendants' employees "are forbidden to disclose limited access

or internal corporate data (as defined by the policy) or distribute such data in any medium, except

as required by your job responsibilities."  W&T's Policy to Access Corporate Data, which applied

to Defendants as the Company's de facto IT department, includes similar obligations.

10.     W&T employees are also obligated to protect the secrecy of Trade Secret and other

confidential company information via a "Non-Solicitation and Non-Disclosure Agreement."  One

such agreement provides, *inter alia*, that W&T trade secrets and other confidential information

must be "kept secret" and may not be "disclose[d] to any other person or entity . . . or use[d] . . .

to Employee's own advantage or to the advantage of others":

**2.**      **Non-Disclosure of Confidential Information.** Employee agrees and acknowledges as follows:

(a)      The term "Confidential Information" includes information of any nature and in any form which at the time or times concerned is not generally known to those persons engaged in a business similar to that conducted or contemplated by the Company and which relates to any one or more of the aspects of the Company's business, research and development, or other actual or potential products or services of the Company, including, but not limited to, patents and patent applications; production techniques; research in progress; existing and proposed investments and investment strategies; seismic, well-log and other geologic and oil and gas operating and exploratory data; proposals; pricing information; development projects; methods, policies, processes, formulas, trade practices, trade secrets, techniques, know-how, and other knowledge; information relating to other employees of the Company; marketing strategies; sales, advertising, promotions, or financial matters; clients, lists of clients, or clients' purchases and purchasing history;

(e)      During Employee's employment with the Company, and thereafter, without regard to the reason(s) for such termination, he or she will keep secret and not disclose to any other person or entity the Confidential Information or use the Confidential Information to Employee's own advantage or to the advantage of others;

11.      Furthermore, W&T requires its employees to agree to W&T's Code of Ethics, which includes restrictions on employees' access, use, and dissemination of confidential information, including W&T Trade Secrets.

12.      W&T also restricts and controls access to its Trade Secrets through the use of data and physical security measures.  W&T password-protects and limits access to applications and files containing Trade Secrets on its system, and it limits physical access to W&T facilities where Trade Secrets may be accessed to authorized personnel, including by requiring employee badges.

**B.      Over the years, Defendants gradually increased their footprint until they effectively served as W&T's *de facto* IT Department.**

13.      W&T has outsourced substantially all of its information technology infrastructure and the management and servicing of such infrastructure to a limited number of third-party service providers.  In 2018, Defendants began providing information technology services to W&T pursuant to oral agreements, and Secure Cloud later entered into a written agreement with W&T (each a "Data Management Contract").  Over the years, Defendants began providing an increasing number of IT-related services to W&T.  And until recently, Defendants were acting as W&T's IT

4

Department.  As part of their services, Defendants manage, maintain, and secure a variety of W&T's Systems and Electronic Data, including its Microsoft Exchange servers, Microsoft SharePoint servers and network drives, and associated data.

14.    Defendants also manage, maintain, and secure W&T's Trade Secrets.  Because of their role as W&T's *de facto* IT Department, Defendants have access to W&T's Trade Secrets.

**C.    When W&T indicated it intended to bring its IT function in house, AAIT promised to facilitate W&T's orderly transition of IT services.**

15.    W&T recently hired a CIO who became concerned about Defendants' contract performance and raised some of those concerns with Defendants.  Over the course of discussions between the parties, Defendants recognized that the parties' contractual relationship might be ending and that they were obligated to commit to an orderly transition to another IT services provider.

16.    For instance, on July 25, AAIT represented that it "does not dispute W&T's ownership of W&T's devices, applications, and data."  And AAIT stated that to "the extent AAIT and W&T's business relationship ceases, the parties must work together to ensure that each respective party's assets are handled and transferred appropriately.  AAIT is willing to work with W&T cooperatively to ensure that this occurs."

17.    AAIT reiterated this understanding of the parties' agreement three days later.  On July 28, AAIT suggested that the parties "discuss cancelling the contract, an orderly removal of AAIT's equipment and software from all W&T platforms and systems, and the immediate transition of IT services to another provider."

18.    W&T recognized that the parties should move forward with the orderly transition. On a July 29, 2022 call, W&T requested – and AAIT agreed to provide – a comprehensive list of all services Defendants were providing to W&T, the hardware and software systems Defendants

4

control, and Defendants' positions on the ownership of all hardware/software associated with Defendants' IT services to W&T.

19.     On August 3, 2022, AAIT sent a letter purporting to formally terminate the Data Management Contract and stated that "AAIT intends to conclude its business relationship with W&T with regard to all services that AAIT currently provides to W&T by September 2, 2022." In that letter, AAIT again represented that it would "work cooperatively with W&T to facilitate an orderly transition of all IT services to another IT provider or, alternatively, to W&T to handle internally." In subsequent letters, AAIT recognized that the transition would not be simple, would require coordination between the parties in light of the "size and scope of th[e] transition," and might require AAIT to provide services beyond September 2, 2022.

**D.     Defendants are refusing to provide W&T with certain information it requires to complete transition of its IT services.**

20.     Despite their representations, Defendants have continued to drag their feet and have failed to work expeditiously towards transitioning W&T's IT services.  Most fundamentally, Defendants still have not provided comprehensive lists of the hardware and software systems they control, necessary physical and logical access to W&T hardware and software, details of the mapping and configuration of W&T's network infrastructure, or support for Defendants' positions on what hardware used to provide W&T services the Defendants own.  Accordingly, on August 8, W&T reminded AAIT that it needed fundamental information before the parties' planned transition meeting.  W&T added that it could not evaluate whether a September 2, 2022 termination of service date is appropriate because AAIT had failed to provide this information.  AAIT responded by denying that it had promised to provide this information.  W&T also demanded that Defendants return W&T's Systems and Electronic Data to it in an orderly manner.

21.     If W&T cannot transition its IT function in an orderly manner from Defendants to either another IT provider or to W&T to handle internally, W&T's ability to monitor its production and accurately prepare its results of operations in a timely fashion will be impaired.  Additionally, without Defendants' effective cooperation, W&T's Systems and Electronic Data may become damaged, irreparably injuring W&T.

22.     Defendants' refusal to take steps to transition the IT function to W&T is, in effect, a knowing refusal to return W&T's trade secrets to it and to return W&T's Systems and Electronic Data.  Defendants have refused to provide the support needed to transition the control over W&T's data back to W&T.  Moreover, Defendants have also refused to provide back-up data of Trade Secret and other information in a form accessible to W&T and access to hardware W&T owns, hampering W&T's efforts to use that back-up data and hardware to facilitate the process of transferring the IT function.

23.     Defendants have leveraged their refusal in negotiations with W&T, in an apparent attempt to gain monetary or other favorable terms.  Defendants' conduct constitutes a transparent misappropriation of W&T's Trade Secrets.

**E.     Defendants have employed gamesmanship and removed this case to federal court on the eve of the preliminary injunction hearing.**

24.     W&T filed its Verified Original Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction in Harris County, Texas state court on August 19, 2022.  (Dkt. No. 1-1 at 8-44.)  That same day, the court entered a TRO, stating:

1.  W&T is entitled to a temporary restraining order and has satisfied the
    requirements for a TRO to be granted, *although defendant's don't agree with this
    and this finding is for purposes of this order only.*

2.  W&T's application for a temporary restraining order is therefore **GRANTED**
    **AND AGREED TO AS FOLLOWS:** It is **AGREED AND ORDERED** that
    Defendants, All About IT, Inc. and Secure Cloud, LLC (and their owners,
    employees, representatives, and agents) are to provide and W&T Offshore, Inc.
    agrees to accept the same level of services that Defendants were providing to
    W&T Offshore, Inc up to and including the date of June 30, 2022. Also, W&T
    Offshore, Inc. agrees to continue to pay Defendants at the same rate for the same
    services as were being provided and paid on June 30, 2022. It is the express
    intent of this order to return the parties to the status quo *ante* that existed between
    the parties as of June 30, 2022. No party shall take any action or fail to perform
    any action that would interfere with, frustrate or prejudice the interests of either

4

party. It is further agreed and ORDERED that W&T Offshore, Inc. is not required
to provide any access to the Plaintiff's Corporate Email and Defendant shall have
no responsibility to maintain or service same. Also, this agreement does not apply
to MB113. Plaintiff shall not be obligated to reinstate the company credentials of
Mr. Ramesh Arumugam but Defendants' technicians will continue to have the
same access as existed on June 30, 2022.

It is further **ORDERED** that W&T is to post a surety or cash bond with the Clerk of
Court in the amount of $500.00.

This matter is set for a temporary injunction hearing in the 151st Judicial District Court
of Harris County, Texas at 3:30 p.m. on the 29th day of August, 2022.

**SO ORDERED.**
SIGNED on August 19, 2022, at 4:16 a.m./p.m.

The Honorable Tanya Garrison
Sitting as Ancillary Judge, Harris County,
Texas

(Dkt. No. 1-1 at 45-56.)

25.     Shortly before the August 19 preliminary injunction hearing, the court informed the

parties that it was not available for a preliminary injunction hearing until September 20, 2022, and

extended the TRO until that date. (*See* Dkt. 1-1 at 250.) The parties then filed respective

emergency motions for expedited discovery, which the court granted in part. (Dkt. No. 1-1 at 113-

130.)

26.     On August 31, 2022, Defendants filed a motion to reconsider the extension of the TRO arguing that under Texas law, the TRO expires at the end of the day on September 16, 2022. (Dkt. 1-1 at 168 – 180.)  Recognizing this issue, the court scheduled a preliminary injunction hearing for September 16, 2022, at 9:00 a.m.

27.     On September 14, 2022, Defendants refused to present their corporate representative for the agreed upon and duly noticed deposition, and W&T obtained a certificate of non-appearance at the deposition.  Hours later, Defendants filed their notice of removal.

## APPLICATION FOR TEMPORARY RESTRAINING ORDER
## AND TEMPORARY INJUNCTION

28.     W&T asks that, to maintain the status quo, the Court extend the existing Temporary Restraining Order for good cause until the Court can hold a hearing on the application for a temporary injunction and order Defendants and their owners, employees, representatives, and agents to:

- Preserve all W&T data and any related software and files except with the prior written consent of W&T and refrain from using or disclosing W&T's trade secrets;

- Provide physical access to leased spaces where W&T hardware, software, and operations are maintained at the data centers located at (a) 5150 Westway Park Blvd., Houston, Texas 77041 (the "Houston Data Center") and (b) 7301 Metropolis, Austin, TX 78744 (the "Austin Data Centers" and collectively with the Houston Data Center the ("Data Centers"), to facilitate physical access to all hardware owned or used by or for W&T or that contain W&T data and W&T's removal of any hardware that it owns from the Data Centers;

- Provide administrative credentials to all hardware and software owned, leased, or licensed by or for W&T, including the VMWare Hypervisor and each of the applicable virtual machines;

- Provide a thorough configuration of W&T's Cisco Call Manager, compilation of all W&T's Direct Inward Dialing (DID) phone numbers, and compilation of all W&T's Session Initiation Protocol (SIP) addresses;

- Provide administrative credentials for Dish Network, Lumen, Palo Alto, and any other providers of communication services provided to W&T, including at W&T offshore platforms and W&T offices; and

- Work with W&T to transfer the accounts and/or contracts for all vendors, services providers, and technology providers/licensors providing services and/or technology to W&T, including the Internet aforementioned circuit providers, Microsoft, Citrix, and VMWare; and

- Comply with its contractual obligation to cooperate with W&T to provide the same historic services and to facilitate an orderly transition of all IT services to another IT provider or to W&T to handle internally

29.     W&T asks this Court to set this Application for a temporary injunction for hearing by Friday, September 16, 2022 so that its injunction does not lapse.  Without this relief, W&T may not have access to its Systems and Electronic Data, which could have a material adverse effect on its financial condition, liquidity, or results of operations or the integrity of the systems, processes, and data needed to run its business.

### A.      TRO and Temporary Injunction Standard

30.     W&T is entitled to a writ of injunction under Federal Rule of Civil Procedure 65 and principles of equity.  Fed. R. Civ. P. 65; *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999) ("[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by [Rule 65] and depend on traditional principles of equity jurisdiction." (alterations in original) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2941, p. 31 (2d ed.1995)).  The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction.  *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).  To be entitled to a TRO or preliminary injunction, W&T must show (1) irreparable injury, (2) no adequate remedy at law, (3) a likelihood of success on the merits, (4) the threatened injury outweighs the threatened harm to the defendant, and (5) injunctive relief would not disserve the public interest.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (preliminary injunction); *see also Clark*, 812 F.2d at 993.  W&T has established each of these.

   *31.*     Additionally, this Court may extend an existing TRO that has been entered in state court.  *See Genius Fund I ABC, LLC v. Gary I Shinder,* 2:21-cv-03765-CAP-MAA, 2021 WL 2136414 at *7 (C.D. Cal. May 26, 2021) (granting extension of state-issued TRO in removed case to allow Plaintiff time to reinstitute preliminary injunction proceedings).  A district court can extend a TRO for good cause until a preliminary injunction hearing is held or the court issues a ruling on a preliminary injunction.  *See S.E.C. v. Comcoa Ltd.*, 887 F. Supp. 1521, 1526 (S.D. Fla. 1995) ("While TRO[s] cannot be extended indefinitely, they can be extended pending a ruling on a motion for a preliminary injunction."); *S.E.C. v. Unifund Sal*, 910 F.2d 1028, 1034 (2d Cir. 1990) ("Nothing in Rule 65 of the Federal Rules of Civil Procedure prevents a district court from continuing a TRO while reserving decision on a motion for a preliminary injunction."); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary K. Kane, Fed. Prac. & Proc. Civ. § 2953 (3d ed. April 2022 Update) ("The history and purpose of temporary restraining orders support the argument that there may be situations in which a temporary restraining order may remain in effect beyond a total of 28 days.").  Although Rule 65 does not define good cause, it should be found where "the grounds for originally granting the temporary restraining order continue to exist" or "the court's calendar cannot reasonably accommodate an earlier setting for the preliminary injunction hearing." *Flying Cross Check, L.L.C. v. Cent. Hockey League, Inc.*, 153 F. Supp. 2d 1253, 1260 (D. Kan. 2001); *see also Samsung Elec. Co. v. Early Bird Savings*, No. 13-CV-3105-BEN (DHB), 2014 WL 324558, at *2 (S.D. Cal. Jan. 27, 2014) (recognizing that a TRO might extend beyond 28 days where defendants would otherwise evade justice).  That is the case here – a preliminary injunction hearing was scheduled for September 16, the day the TRO expires, but

Defendants removed the case two days before the hearing.  W&T requests that the Court extend the TRO until it can hold a hearing and rule on W&T's request for a temporary injunction.

>    **1.    *W&T faces irreparable injury with no adequate remedy at law.***

32.    "[A] harm is irreparable where there is no adequate remedy at law, such as monetary damages.  However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'"  *Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022) (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011)).  "[W]hen economic rights are especially difficult to calculate, a finding of irreparable harm may be appropriate."  *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 (5th Cir. 1991) (holding that where damages to reputation and impacts on sales are too speculative to calculate, there was irreparable injury).  "[C]ourts around the country agree that the interference with an entity's control of its computer systems constitutes irreparable injury."  *Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1296 (S.D. Fla. 2020) (collecting cases and finding that activities that impact the integrity of plaintiff's computer system cause irreparable harm); *see also Enargy Power Co. v. Xiaolong Wang*, No. 13-11348-DJC, 2013 WL 6234625, at *10 (D. Mass. Dec. 3, 2013) (finding that the defendant's accessing and encrypting information on his former employer's server, preventing the former employer from enjoying uninterrupted use of its property and potentially impacting goodwill, constitutes irreparable harm).  Additionally, "[t]he threatened disclosure of trade secrets constitutes irreparable injury as a matter of law" in Texas.  *Heil Trailer Int'l. Co. v. Kula*, 542 F. App'x 329, 336 (5th Cir. 2013) (alteration in original) (citation omitted).

33.    The holdings in *Florida Atlantic* and *Enargy* make sense.  In today's world, public companies need access to electronic data and IT systems to operate effectively.  This is why W&T paid Defendants handsomely for their IT services.  W&T needs to have access to all of its Systems and Electronic Data to ensure that it can operate effectively in the ordinary course of business.  If

W&T cannot access or effectively use its Systems and Electronic Data, that could harm its ability to operate in a wide range of areas.  For instance, without an orderly transition to either another IT provider or to W&T to handle internally, W&T's ability to perform its management and operational duties, to monitor its production, or to prepare its results of operation could be impaired.  There is no way to quantify damages to W&T that will be caused by failing to transition W&T's Systems and Electronic Data to either another IT provider or to W&T to handle internally without engaging in speculation.

34.    The Texas state district court already concluded that W&T would face irreparable harm and entered a temporary restraining order.  (Dkt. 1-1 at 45.)  Now Defendants have continued to obstruct an orderly transition and have removed this case before the temporary injunction hearing that was scheduled just two days from the notice of removal.  Defendants are not taking the necessary steps to ensure that the IT services can be transitioned to either another IT provider or to W&T to handle internally.  And Defendants' refusal to turn over and hold hostage W&T's Trade Secrets constitutes irreparable harm.    Accordingly, without this Court's immediate intervention, W&T faces an imminent risk of irreparable injury.

**2.    *W&T is likely to succeed on the merits of its claims.***

35.    ***Defendants have misappropriated trade secrets.***  To successfully establish a Texas Uniform Trade Secrets Act ("TUTSA") claim, the claimant must show that (1) it owns a trade secret, and (2) the defendant misappropriated the trade secret.  Tex. Civ. Prac. & Rem. Code §§ 134A.002(3-a) ("Owner" means, with respect to a trade secret, the person or entity in whom or in which rightful, legal, or equitable title to, or the right to enforce rights in, the trade secret is reposed."), (3) (defining "misappropriation"), (6) (defining "trade secret"); *Reilly v. Premier Polymers, L.L.C.*, No. 14-19-00336-CV, 2020 WL 7074253, at *4 (Tex. App.—Houston [14th Dist.] Dec. 3, 2020, pet. dism'd).  A trade-secret owner may seek damages or injunctive relief for

4

the misappropriation of its trade secrets.  Tex. Civ. Prac. & Rem. Code §§ 134A.003 (injunctive

relief), 134A.004 (damages); *Reilly*, 2020 WL 7074253, at *4.

36.     The TUTSA defines a "trade secret" as follows:

all forms and types of information, including business . . .economic . . . and
any . . . compilation . . . if: (A) the owner of the trade secret has taken reasonable measures
under the circumstances to keep the information secret; and (B) the information derives
independent economical value, actual or potential, from not being generally known to, and
not being readily ascertainable through proper means by, another person who can obtain
economic value from the disclosure or use of the information.

37.     Tex. Civ. Prac. & Rem. Code § 134A.002(6).  "This standard requires that the

owner of the trade secret take reasonable measures but does not require proof that the alleged trade

secrets have been held in absolute secrecy in order to establish the existence of a trade secret or

that information is worthy of trade secret protection pending final resolution on the merits." *TASF,*

*LLC v. Turn2 Specialty Cos.*, NO. 01-21-00089-CV, 2022 WL 709836, at *8 (Tex. App.—Houston

[1st Dist.] Mar. 10, 2022, no pet. (citing *HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254,

266 (Tex. 2021)).

38.     As discussed *supra*, W&T has expended considerable efforts and resources to

develop, invest in, and protect Trade Secrets related to all facets of its business, including but not

limited to confidential and proprietary (i) seismic data, (ii) drilling plans and locations, and (iii)

well and reserve information.  These Trade Secrets are valuable to W&T's ongoing success in the

oil and natural gas industry, and provide benefits that flow to W&T by virtue of the fact that these

Trade Secrets are kept proprietary to W&T and are not generally known to the public or others in

the oil and natural gas industry.

39.     To that end, W&T has made reasonable efforts to keep these Trade Secrets

confidential, including by: (i) requiring W&T employees to sign confidentiality agreements

prohibiting unauthorized disclosure or use of Trade Secret information; (ii) requiring W&T

4

employees to assent to a Code of Ethics containing restrictions on access, use, and dissemination of confidential information and Trade Secrets; (iii) contracting with Defendants for the provision of services related to securing Trade Secret data; (iv) password-protecting and limiting access to applications and files containing Trade Secrets; and (v) limiting physical access to W&T facilities where Trade Secrets may be accessed to authorized personnel, including by requiring employee badges.  Defendants' employees have even signed agreements acknowledging confidentiality obligations with respect to W&T's information.

40.     Second, TUTSA provides that "misappropriation" includes the "use of a trade secret of another without express or implied consent" by a person who "at the time of . . . use, knew or had reason to know" that his "knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret[.]" Tex. Civ. Prac. & Rem. Code § 134A.002(3)(B)(ii)(b).  Defendants are currently misappropriating W&T's Trade Secrets by withholding their effectual and orderly return.  Throughout the duration of the parties' contractual relationship, W&T provided Defendants with access to Trade Secret information – along with other W&T company data – to facilitate Defendants' provision of IT services, including security-related services.  Yet now, as the parties' contractual term approaches its end, Defendants have refused to return W&T's Trade Secret information, including by refusing to provide back-up data of Trade Secret and other information in a form accessible to W&T and refusing to take steps necessary to transition IT functionality back to W&T, in an apparent attempt to gain monetary or other favorable terms.  Defendants' transparent attempt to "hijack" W&T's Trade Secrets constitutes misappropriation.  *See Sears Authorized Hometown Stores, LLC v. Y&O WF, LLC*, No. 7:18-cv-00083-O-BP, 2018 WL 6608354, at *4 (N.D. Tex. Nov. 29, 2018), *report and recommendation adopted*, No. 7:18-cv-00083-O-BP, 2018 WL 6603813 (N.D. Tex. Dec. 17,

2018) (applying TUTSA and holding that a defendant's "refusal to return trade secrets . . . to the potential disadvantage" of the plaintiff constitutes a "use" of trade secrets sufficient to allege misappropriation).

41.     ***Defendants have breached their Data Management Contracts.***  Since 2018, W&T has contracted with Defendants to (among other things) manage, maintain, and secure W&T's Systems and Electronic Data, communications, and physical security systems.  In exchange for Defendants' services, W&T compensates Defendants.  W&T has fully performed its contractual obligations.  *See Valero Mktg. & Supply Co. v. Kalama Int'l.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (holding that an essential element of a breach of contract claim is plaintiff performing or tendering performance).

42.     A breach of contract occurs when a contracting party fails – without a legal excuse – to perform a promise that is part of the agreement or does something inconsistent with the agreement.  *See B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  Here, W&T retained Defendants to maintain and store its Systems and Electronic Data, communications, and physical security systems.  These contractual obligations included cooperating with the transition to another IT provider or to W&T to handle internally – as AAIT recognized when it agreed to:

- provide a comprehensive list of all services it was providing to W&T, the hardware and software systems it controls, and its position on the ownership of all hardware and software associated with its IT services to W&T; and

- "work *cooperatively* with W&T to facilitate an *orderly transition of all IT services* to another IT provider or, alternatively, to W&T to handle internally."

43.     Defendants have since refused to deliver their end of the bargain.  They are not providing the information they are obligated to provide, nor are they otherwise cooperating in the orderly transition of W&T's IT services to another IT provider or to W&T to handle internally.

4

These refusals are breaches of Defendants' obligations under the Data Management Contracts. *See Texas Ear Nose & Throat Consultants, PLLC v. Jones*, 470 S.W.3d 67, 78 (Tex. App.— Houston [1st Dist.] 2015, no pet.); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) (material breach occurs when injured party is deprived of the benefit it reasonably could have anticipated from the breaching party's performance); *see, e.g.*, *Yeh v. Praire E&L Mgmt., LLC*, Case No. 20-3124, 2020 WL 6930519, at *4–5 (C.D. Ill. Aug. 28, 2020) (concluding that in an Administrative Services Agreement between plaintiff eye doctor and defendant Prairie E&L Management, defendant was obligated to cooperate in the transition of the doctor to a new management services provider – per the parties Administrative Services Agreement – and could not otherwise unilaterally transfer the doctor's stock to new physicians).

44.     W&T's Systems and Electronic Data are its property.  And, of course, W&T uses its Systems and Electronic Data to run its business.  By refusing to (1) supply the list of services Defendants provided to W&T, or (2) assist in the orderly transition of services to another IT provider or to W&T to handle internally, Defendants have created an imminent risk of injury to W&T.  That decision could impair W&T's ability to monitor its production and accurately prepare its results of operations in a timely fashion.  W&T's imminent risk of injury is a natural, probable, and foreseeable consequence of Defendants' breaches.  *See Winograd v. Clear Lake City Water Auth.*, 811 S.W.2d 147, 156 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (concluding there was "natural, probable, and foreseeable" causation from a water authority's denial of sewage services – which it contracted to provide to plaintiff developer – to the developer's inability to continue an apartment development).

45.     ***Defendants have breached their fiduciary duties***.  A fiduciary duty may arise from certain formal legal relationships or informal personal relationships, and may be created by

contract.  *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet.

denied).  A fiduciary relationship is created by contract when a party specifically promises to act

as a fiduciary with respect to another in the course of a relationship.  *See Lincoln Gen. Ins. Co. v.*

*U.S. Auto Ins. Servs., Inc.*, 787 F.3d 716, 727 (5th Cir. 2015) (applying Texas law and noting that

fiduciary relationship may be created by explicitly agreeing to act as a fiduciary under a contract).

That is the case here: Defendants' principal has recognized that Defendants act as fiduciaries to

W&T, recently writing W&T that he "did not violate anything on [sic] my fiduciary

responsibility."  The fiduciary relationship is particularly important here, given Defendants' role

as W&T's outsourced IT Department.  A company's data is its lifeblood; if the flow of information

stops or is hindered, the company risks significant harm.

46.     Fiduciaries are obliged to place the interests of their beneficiaries before their own.

*Cruz v. Ghani*, No. 05-17-00566-CV, 2018 WL 6566642, at *6–12 (Tex. App.—Dallas Dec. 13,

2018, pet. denied) (affirming jury verdict that found breach of fiduciary duty because defendant

placed his own interests before the interests of the party to whom he owed fiduciary duties).  By

refusing to cooperate with the orderly transition, Defendants have breached their fiduciary duties

to W&T by placing their own interests over the interests of W&T.  *See, e.g.*, *Daniel v. Falcon*

*Interest Realty Corp.*, 190 S.W.3d 177, 185 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (noting

fiduciary duties require fiduciary to act primarily for the benefit of another in matters connected

with fiduciary's undertaking).  As explained above, Defendants' refusal to cooperate in an orderly

transition has caused W&T's immediate and imminent injury.

47.     ***Defendants have wrongfully converted W&T's Systems and Electronic Data.***

"The tort of conversion involves the unauthorized and unlawful assumption and exercise of

dominion and control over the personal property of another to the exclusion of and inconsistent

with the other's superior rights in the property." *Hilburn v. Storage Tr. Properties, LP*, 586 S.W.3d 501, 508 (Tex. App.—Houston [14th Dist.] 2019, no pet.).   To prove conversion, W&T must establish that it is the owner of the personal property or is entitled to its immediate possession.  *See FCLT Loans, L.P. v. Estate of Bracher*, 93 S.W.3d 469, 482 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see also Cage Bros v. Whiteman*, 163 S.W.2d 638, 640–41 (Tex. 1942) (converted property must be personal property).  The Systems and Electronic Data is the personal property of W&T.  *See McGuire-Sobrino v. TX Cannalliance LLC*, No. 05-19-01261-CV, 2020 WL 4581649, at *6 (Tex. App.—Dallas Aug. 10, 2020, no pet.) (analyzing conversion claim over digital assets and treating the assets as personal property); *see also Cuidad Casero Home Health v. Ayuda Home Health Care Servs.*, 404 S.W.3d 737, 749 (Tex. App.—El Paso 2013, no pet.) (confidential information can be converted).

48.     Any act that interferes with W&T's free use and enjoyment of its property is an act of dominion or control.  *See Hilburn*, 586 S.W.3d at 509.  The interference need not be permanent or a physical taking.  *See Waisath v. Lack's Stores*, 474 S.W.2d 444, 447 (Tex. 1971).  That is the case here: W&T demanded that Defendants return its Systems and Electronic Data.  Defendants' refusal to return W&T's Services and Electronic Data has interfered with W&T's use of its data and hinders W&T's ability to effectively run its IT operations.  Accordingly, Defendants' have wrongfully converted W&T's property.

### 3.     *The threatened injury to W&T far outweighs the threatened harm to Defendants, who simply need to continue to provide the services they contracted to perform.*

49.     The threatened injury to W&T outweighs any potential harm Defendants will face.  *See Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008).  There is no cognizable harm to Defendants to force them to comply with the terms of their contract with W&T and to restore access to W&T's Trade Secrets to W&T.  *See Citigroup Glob. Markets Inc. v.*

*Rothermund*, No. 06CV622-PHX-FJM, 2006 WL 1663378, at *2 (D. Ariz. Mar. 10, 2006) ("the balance of hardships tips in favor of the plaintiff because plaintiff could be harmed by defendants' breach while defendants cannot be harmed by being required to comply with their contracts"); *Arcadia Health Servs., Inc. v. A+ Health Care, Inc.*, No. 96 C 8363, 1997 WL 24737, at *5 (N.D. Ill. Jan. 17, 1997) ("There is no harm to [defendant] by forcing her to comply with the terms of her contract with [plaintiff].").

       ***4.      Granting the TRO would serve the public interest by holding Defendants to their bargain.***

       50.      The public interest will be served by enforcing the parties' contract, compelling Defendants to obey the law, and protecting a vital public interest – the production of hydrocarbons when everyday petroleum prices have skyrocketed. "[T]he public has an interest in valid contracts being enforced." *Id.* at *5. Furthermore, the public has an interest in the law being followed. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). Finally, the Court should consider the potential impact to the public at large, which may include interests of consumers. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985) (finding public's interest in avoiding overcharges weighed in favor of injunctive relief). First, the public has a clear interest in compelling Defendants to uphold their end of the bargain under the Data Management Contracts. Second, the public has an interest that Defendants obey the law and return W&T's Trade Secrets. Third, a disruption to W&T's results of operations caused by impacts to W&T's IT infrastructure would negatively impact the public's interest in reliable and inexpensive energy.

       **B.      The Court may issue a TRO requiring Defendants to maintain the status quo.**

       51.      The purpose of a preliminary injunction is to preserve the status quo and prevent irreparable injury until the court renders a decision on the merits. *Sambrano v. United Airlines,*

*Inc.*, No. 21-11159, 2022 WL 486610, at *4 (5th Cir. Feb. 17, 2022).  TROs may require a party to perform an affirmative act or mandate a specific course of conduct to compel the performance of a duty.  *In re Bahadur*, 441 F. Supp. 3d 467, 473 (W.D. Tex. 2020) (compelling medical staff to provide medical care, hydration, and food to detainee on a hunger strike to preserve the detainee's life).

  *52.* The affirmative relief W&T seeks maintains the status quo.  The status quo is that W&T is able to operate effectively and has a functioning and effective IT system.  Defendants have communicated that they will no longer provide IT services but refuse to take the steps needed to maintain W&T's IT system while it moves to a new provider.  Defendants should be required to cooperate in the orderly transition of IT services to either another IT provider or to W&T to handle internally.  Where parties have agreed to continue a course of conduct under a contract, the status quo may be the continued provision of services a party provides.  *See Axia NetMedia Corp. v. Mass. Tech. Park Corp.*, 889 F.3d 1, 12 (1st Cir. 2018) (upholding preliminary injunction requiring a party to "continue to provide, through its affiliates . . . the same level of service that those affiliates are currently providing" (alteration in original) (citation omitted)).  And the Court can order Defendants to provide a comprehensive list of the services they are providing, the hardware and software IT systems they control, and their position on the ownership of those systems.  *See DirecTV, LLC v. E&E Enters. Glob., Inc.*, No. 17-06110-DDP-PLA, 2017 WL 4325585, at *7 (C.D. Cal. Sept. 25, 2017) (ordering defendant to turn over a list of customer contract information so DirecTV could complete a transition in service).

  **C.** **The bond should be nominal.**

  53. Before the Court grants a TRO or temporary injunction, W&T must post a security in the amount set by the Court.  *See* Fed. R. Civ. P. 65(c).  In fixing the amount of the security or bond, a court is guided by the underlying purpose of Rule 65(c): "to provide a mechanism for

reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Industrial Insulation Grp., LLC v. Sproule*, C.A. No. H-08-3482, 2009 WL 10694151, at *3 (S.D. Tex. Apr. 16, 2009) (quoting *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999)). If the court finds only a remote risk of harm, a nominal bond – or even a bond of $0 – may suffice. *See Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978) ("The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all."). Here, a nominal bond is justified. Enjoining Defendants from ceasing to continue to service a long-time customer will not harm them. To the contrary, it merely requires Defendants to do what IT vendors do in the ordinary course – and what AAIT affirmed it would do. And W&T of course will continue to pay AAIT for its services. Moreover, AAIT's principal agreed in his vendor contract to waive any requirement that W&T post any bond.

## Conclusion

For the foregoing reasons, W&T respectfully requests that the Court hold a temporary injunction hearing by September 16, 2022, or alternatively, enter and extend the temporary injunction as described above until the application for temporary injunction can be heard and ruled upon.

Dated: September 15, 2022

Respectfully submitted,

**THE HALL LAW GROUP, PLLC**

*/s/ Ryan Finnegan*
**Benjamin L. Hall, III**
State Bar No. 08743745
Federal Bar No. 8787
bhall@thlf.us
**William L. Van Fleet II**
State Bar No. 20494750
Federal Bar No. 3670

4

bvfleet@comcast.net
**Ryan Finnegan**
State Bar No. 24119322
Federal Bar No. 3689829
rfinnegan@thlf.us
THE HALL LAW GROUP
530 Lovett Blvd.
Houston, Texas 77006
Telephone:  (713) 942-9600
Facsimile:  (713) 942-9566

-AND-

**THE HITTNER GROUP, PLLC**

**George J. Hittner**
State Bar No. 24038959
S.D. TX No. 431901
george.hittner@thehittnergroup.com
P.O. Box 541189
Houston, Texas 77254
Phone: (713) 505-1003

<u>**CERTIFICATE OF CONFERENCE**</u>

I certify that on September 15, 2022, I emailed counsel for AAIT and asked whether Defendants oppose the relief requested in the motion.  Counsel for AAIT who spoke on behalf of Defendants opposed the requested relief.


EXECUTED on September 15, 2022.


*/s/  Benjamin L. Hall, III*
**Benjamin L. Hall, III**

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that all counsel of record were served a copy of the foregoing on September 15, 2022.

*/s/ Benjamin L. Hall, III*
**Benjamin L. Hall, III**