1               UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3    *****************************************************************

4    W&T OFFSHORE, INC.              4:22-CV-03149

5
     VS.                            HOUSTON, TEXAS
6

7    ALL ABOUT IT, INC., ET AL      SEPTEMBER 15, 2022

8
     *****************************************************************
9
                      TRANSCRIPT OF MOTION
10        FOR TEMPORARY RESTRAINING ORDER PROCEEDINGS
          HEARD BEFORE THE HONORABLE LYNN N. HUGHES
11               UNITED STATES DISTRICT JUDGE

12   *****************************************************************

13
     APPEARANCES:
14

15   FOR THE PLAINTIFF:              MR. BENJAMIN L. HALL, III
                                     Hall Law Firm
16                                   530 Lovett Blvd
                                     Houston, Texas 77006
17

18                                   MR. GEORGE JACOB HITTNER
                                     The Hittner Group
19                                   PO Box 541189
                                     Houston, Texas 77254
20

21   FOR THE DEFENDANTS:             MR. REYMUNDO G. RODRIGUEZ, IV
                                     Foley Lardner, LLP
22                                   1000 Louisiana Street
                                     Suite 2000
23                                   Houston, Texas 77002

24
             Proceedings recorded by mechanical stenography,
25   transcript produced via computer.

```
1                                    MR. ETHAN GRAHAM GIBSON
                                     Gibson Wunder
2                                    4 Houston Center
                                     1221 Lamar Street
3                                    Suite 1001
                                     Houston, Texas 77010
4

5
     Official Court Reporter:       David S. Smith, CSR, RPR, CRR
6                                    Official Court Reporter
                                     United States District Court
7                                    Southern District of Texas
                                     515 Rusk
8                                    Room 8004
                                     Houston, Texas 77002
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EXAMINATION INDEX**

PAGE NO.

**Conference**........................................    4

**Alvin T. Haynes**

     Direct Examination by Mr. Hall..............    6

1          **P R O C E E D I N G S**

2          THE COURT:  I have been advised that there will be

3   witnesses?

4          MR. HALL:  We have them available for the Court should

5   you choose to take evidence.

6          THE COURT:  Is it like those three people?

7          MR. HALL:  No, sir.  We brought the chief information

8   officer from our company.

9          MR. GIBSON:  Your Honor, we have our chief executive

10  available, although we assumed that we were going to be arguing

11  just documents and evidence; but we're happy to put on evidence

12  if the Court would like it.

13          I do have, however -- that is my paralegal right

14  there, Emily Gilmore.

15          THE COURT:  Which one is your paralegal?

16          MR. GIBSON:  This young lady right here.

17          THE COURT:  Well, sit her at the table.  That's where

18  the help is needed.  I've got a crutch, but I left it in the

19  garage.

20          MR. GIBSON:  We have an Exhibit 4 that we've tendered

21  to the Court, Your Honor.  It's a listing of all of the pieces

22  of hardware that the plaintiffs in this case have purchased.

23  That list was prepared by Ms. Gilmore if there is any objection

24  or any concern about the formation of the document.

25          THE COURT:  Okay.  Okay.  If you wanted to call her to

1    estimate on next weekend's football games, I'd let her do it.

2    I think that was kind of crazy, but she'd probably win better

3    than I would.

4              Who knows about the operations with this system

5    on this company's platform?

6              MR. HAYNES:  I do.

7              MR. HITTNER:  That would be the CIO, Alvin Haynes,

8    Your Honor.

9              THE COURT:  What I want him to do is to describe the

10   use of the machine.  Having spent far too much of my life in

11   oil fields, if you ever want to be humiliated, just go do it

12   and then try to live on it.

13             MR. HITTNER:  If I may, do you want to hear from us or

14   Mr. Haynes first?  I can summarize it for you if you'd like --

15   why we're here and how we're here.

16             This is about an entire system of servers and so

17   forth across multiple rigs and so forth.

18             THE COURT:  Mr. Hittner, as I've had to explain to

19   everybody, including my children, I'm not as dumb as I look;

20   and so let's get to what I need to know --

21             MR. HITTNER:  Yes, Your Honor.

22             THE COURT:  -- with great precision and clarity.

23             Now, you get out of the way.

24             MR. HITTNER:  I'm out of the way.

25             MR. HALL:  Judge, do you want him on the witness stand

1    or here?

2            THE COURT:  Which would you prefer?

3            MR. HITTNER:  Your Honor, I think it's probably more

4    appropriate to have him on the witness stand and sworn.

5                    Your call, Judge.

6            THE COURT:  And your only live witness is Ms. Gilmore?

7            MR. GIBSON:  No, Your Honor.  We have our -- upon

8    learning that they were going to present a witness, we've asked

9    our chief executive to come down.  He will be here momentarily.

10   So we can get started, but our witness will be arriving

11   shortly.

12           THE COURT:  Get him up there.  Apparently we've decided

13   I need to twist my neck.

14                   You can take a seat.  We've had problems with

15   people stealing the seats so we nailed them down and all you

16   can do is hope for a comfortable -- believe me, you can pull

17   the microphone around and please get it as close to you as you

18   can possibly be comfortable.

19           MR. HALL:  May I proceed, Your Honor?

20           THE COURT:  Please, sir.

21                        **ALVIN T. HAYNES**

22   having been first duly sworn, testified as follows:

23                      **DIRECT EXAMINATION**

24   **BY MR. HALL:**

25   Q.   Would you please state your full name.

1    A.    Alvin Haynes.

2    Q.    Where do you live?

3    A.    Houston, Texas.

4    Q.    Where do you work?

5    A.    W&T Offshore.

6    Q.    What do you do there?

7    A.    I'm the chief information officer of W&T Offshore.

8    Q.    In that capacity what are your responsibilities and

9    duties?

10   A.    My responsibilities and duties is to manage and

11   maintain the enterprise --

12        THE COURT:  You're going to have to speak up.

13   A.    -- is to manage and maintain the enterprise network for

14   the company.

15   Q.    What is an enterprise network?

16   A.    It's comprised of many different computers and systems

17   that control our entire IT information assets.  It controls our

18   operations in the Gulf of Mexico.

19   Q.    What does W&T Offshore do?

20   A.    We are an independent oil and gas exploration company with

21   operations in the Gulf of Mexico.

22   Q.    Those operations that are in the Gulf of Mexico, what do

23   they involve?

24   A.    They involve the exploration and production of oil and

25   gas, the drilling of wells and production of the product.

1    Q.    And would you tell the Court how many wells do you-all

2    operate in the Gulf of Mexico?

3    A.    Over 500 wells.

4    Q.    Do you have platforms that actually connect to those

5    wells?

6    A.    Yes, we do.  We have 119 platforms.

7    Q.    All right.  In terms of your operations, you-all have a

8    computer network that keeps you in connection with those oil

9    wells?

10   A.    Yes, we do.

11   Q.    All right.  And can you operate your business without that

12   computer network?

13   A.    No, we cannot.

14   Q.    What are the component parts -- if you can tell us, what

15   are the component parts of the computer network that you must

16   have in order to operate your business?

17   A.    We must have access to our physical servers, which are the

18   computers that compute the data that's inputted into those

19   computers.  We must have control of the networking devices that

20   allows us to communicate with those platforms in the Gulf of

21   Mexico.  Then we must also have access to our data, which is

22   all of our geographical and seismic data that houses our

23   information related to those wells we operate.

24   Q.    You are the chief information officer, and in that

25   capacity do you presently have control over your computer

1    network system?

2    A.    No, I do not.

3    Q.    Who has control over your computer network system?

4    A.    AAITPRO.

5    Q.    That's the defendant that has been sued in this case?

6    A.    Correct.

7    Q.    What service does AAIT provide you-all as it relates to

8    your computer network services?

9    A.    AAIT currently manages and maintains and secures the

10   entire computer network for W&T.

11   Q.    Do you-all pay them for that service?

12   A.    Yes, we do.

13   Q.    Would you tell the judge:  How much do you pay on a

14   monthly basis to AAIT for that service?

15   A.    Over $300,000 on a monthly basis.

16   Q.    How long has AAIT been providing this service for you?

17   A.    Since 2017.

18   Q.    And since 2017 to the present, how much money have you-all

19   paid to AAIT to do this service for you relating to your

20   computer network system?

21   A.    In excess of $13 million.

22   Q.    All right.  Are you presently paying them $300,000 or

23   approximately $300,000 a month for that service?

24   A.    Yes, we are.

25   Q.    All right.  Since 2017 to the present has AAIT, the

1    defendant in the case -- and I'm just going to start referring

2    to them as "the defendant," okay?  Is that all right with you?

3    A.    Yes, it is.

4    Q.    All right.  Have they actually billed you for services as

5    well as equipment that they wanted you to buy for your computer

6    network system?

7    A.    Yes, they have.

8    Q.    All right.  And have you paid those invoices?

9    A.    Each and every invoice has been paid.

10   Q.    Before we get to those invoices, is AAIT right now

11   claiming that they own the equipment that you-all bought?

12   A.    Yes, they are.

13   Q.    Has AAIT taken control over your equipment?

14   A.    Yes, they have.

15   Q.    Passwords.  Let's talk about passwords.  Do you have to

16   have passwords in order to access your computer network?

17   A.    Yes, I do.

18   Q.    Has AAIT permitted you to have passwords now for you to

19   control your system?

20   A.    No, they have not.

21   Q.    The physical equipment that comprises your computer

22   infrastructure, where is that located?

23   A.    It resides at CyrusOne data center in west Houston.

24   Q.    And do you have a backup system to it?

25   A.    Yes, we do.

1   Q.    Where is that?

2   A.    That resides at a secondary data center in Austin, Texas.

3         THE COURT:  Hoffman?

4         MR. HALL:  Austin.

5         THE WITNESS:  In Austin, Texas.

6   **BY MR. HALL:**

7   Q.    So the backup system is in Austin, Texas; is that right?

8   A.    And the primary is in Houston, Texas, correct.

9   Q.    All right.  Tell the Court -- this company is supposed to

10  be providing you service.  Have they blocked you out from your

11  own computer system?

12  A.    Yes, they have.

13  Q.    Tell the Court how they blocked you.

14  A.    They have not provided us physical access to the data

15  centers that houses our computers and our network and equipment

16  and our backup hardware.  They've not provided us with the

17  necessary credentials of usernames and passwords for the

18  network and devices that would allow us to take control of the

19  network.

20  Q.    Have you asked them "Please give us the passwords so that

21  we can now have access to our computer system"?

22  A.    Yes, we have, repeatedly.

23  Q.    And what has been their response?

24  A.    That it would compromise the security of their systems and

25  allow us to see other clients' data.

1    Q.    And as a result they have not given you the passwords?

2    A.    No, they have not.

3    Q.    As you sit here today as the chief information officer of

4    W&T, can you control those wells?

5    A.    No, we cannot.

6    Q.    Do you know whether these wells are being ably and

7    correctly controlled by the computer infrastructure?

8    A.    No, we do not.

9    Q.    Does AAIT even provide you with information to say, "Hey,

10   we're monitoring the wells for you and they're all intact"?

11   A.    No, they do not.

12   Q.    Essentially right now what have you asked of AAIT?

13   A.    We have asked them to return the control of our computer

14   networks to W&T.  We have asked them for access to the physical

15   data center, the one in Austin as well as the one in Houston;

16   and they have refused to provide that access.

17   Q.    Have you told AAIT that you intend to terminate their

18   services?

19   A.    Yes, we have.

20   Q.    What was the response of AAIT after you told them that you

21   were going to terminate their services?

22   A.    They stopped providing services intermittently, and over a

23   period of time they wrote a letter saying they will now

24   terminate services and give us only 30 days to terminate the

25   services.

1    Q.    30 days for you -- and what does terminating the service

2    entail?

3    A.    Shutting down our computer network.

4    Q.    How long would it take you-all if you did everything

5    possible to transfer four years of information into a

6    completely different computer network system?

7    A.    At a minimum of 90 days.  At a minimum.

8    Q.    Have you told AAIT "It's physically impossible for us to

9    transfer this amount of data, this amount of equipment and

10   maintain it, stay in connection with the wells in 30 days"?

11         Have you told them whether you could do that?

12   A.    Yes, we have.

13   Q.    Can you do it?

14   A.    No, we cannot, not in 30 days.

15   Q.    So if we do not -- if the Court chooses not to give you a

16   temporary restraining order or an injunction today, when has

17   AAIT told you that they are no longer going to be providing the

18   services for you.

19   A.    As of Friday, this coming Friday.

20   Q.    Is that tomorrow?

21   A.    That is tomorrow.

22   Q.    Have you filed litigation against AAIT other than what's

23   before this judge?

24   A.    Can you repeat that?

25   Q.    Sure.  You filed a lawsuit, right?

```
1    A.    Yes, we have.

2    Q.    Did you obtain a temporary restraining order against AAIT?

3    A.    Yes, we have.

4    Q.    What did that temporary restraining order require them to

5    do?

6    A.    To continue to provide us uninterrupted service.

7    Q.    That temporary restraining order will lapse, though, in

8    14 days, correct?

9    A.    Correct.

10   Q.    Did you ask also that the temporary restraining order be

11   extended?

12   A.    Yes, we have.

13   Q.    When does that extended TRO end?

14   A.    Tomorrow.

15   Q.    So if we do not get relief today, you're telling the Court

16   that these 500 wells, these 117 platforms will be disconnected

17   and no one available to monitor them?

18   A.    That is correct.

19   Q.    Is that a dangerous condition?

20   A.    Very dangerous.

21   Q.    Now, I assume that you-all also have the hazard of

22   hurricanes in the Gulf of Mexico.

23   A.    Correct.

24   Q.    Is this a necessary component and communications system

25   for you to stay in touch not only with the wells, but with the
```

1   personnel you have on the platforms?

2   A.   Yes, it is, very important.

3   Q.   Who controls that?

4   A.   Ramesh -- AAIT controls that.

5   Q.   As of tomorrow, without a temporary injunction or a

6   restraining order, there's no further communication with even

7   your personnel that are on the platforms?

8   A.   That's correct.

9   Q.   Obviously that's a dangerous condition?

10  A.   It certainly is.

11  Q.   Did you ever -- and by "you" I'm talking about W&T.  Did

12  you-all ever tell AAIT "Take over our system and block us out"?

13  A.   No, we did not.

14  Q.   There's a concept known as conversion where one party

15  takes dominion and control over somebody else's property, okay?

16  I'm supplying that definition to you.

17  A.   Okay.

18  Q.   Has AAIT taken unauthorized dominion and control over your

19  computer system?

20  A.   Yes, they have.

21  Q.   Would you tell the Court this.

22       THE COURT:  Okay.

23       MR. HALL:  Yes, Judge?

24       THE COURT:  The poor man has got enough problems

25  without you teaching him law.  So let's get him back to his

1   life.

2              Would you like a glass of water?

3         THE WITNESS:  I'm fine.  Thank you, Your Honor.

4         THE COURT:  When you want one, say something.

5         THE WITNESS:  Thanks.

6   BY MR. HALL:

7   Q.   You have a stack of documents in front of you.  Do you

8   recognize --

9         MR. HALL:  And we've identified them, Your Honor, as

10  Exhibits 1 through 14.

11        THE COURT:  While we're sort of paused here.  I have a

12  question if counsel won't mind.

13              Are any of the wells managed by your firm

14  actively drilling?

15        THE WITNESS:  I'm not a hundred percent certain, sir.

16        THE COURT:  Pardon?

17        THE WITNESS:  I'm not a hundred percent certain if

18  they're actively drilling.

19        THE COURT:  Does anybody else with the company know?

20        MR. HALL:  You mean drilling or operating?

21        THE COURT:  I'd say --

22        MR. HALL:  Drilling?

23        THE COURT:  They always say, "production" in the

24  papers; and it would be bizarre if you had 75, 150 wells all

25  being drilled in the same area.

1    MR. HALL:  Judge, I think the general counsel has the

2  answer to your question if it's acceptable.

3    MR. CURTH:  Yes, Your Honor.  We're running --

4    MR. HALL:  What's your name?

5    MR. CURTH:  Jonathan Curth, general counsel at W&T.

6    We are running approximately, I want to believe,

7  an 85-million-dollar capital expenditure budget for this year.

8  We're constantly doing reworkings, drilling, completions.  We

9  don't do any fracking in the Gulf of Mexico, but we otherwise

10  do complete the wells.

11    THE COURT:  But you don't do the drilling.

12    MR. CURTH:  We have contractors.

13    THE COURT:  That's the smart way to do it.

14    MR. CURTH:  Yeah.

15    THE COURT:  Then you have somebody to blame.

16    MR. CURTH:  Yeah.  Yeah.

17    THE COURT:  A historic example of that is there was --

18  they were drilling and producing and they realized they were

19  the only one who was doing it.  A giant company like Shell

20  could do it, but it's not normally done by -- nothing keeps you

21  from doing it except maybe rationale-wise.

22    MR. CURTH:  Right.

23    THE COURT:  I want to make sure what we're dealing

24  with.

25    MR. HALL:  Thank you, Judge.  May I proceed?

1      THE COURT:  Yes, sir.

2      MR. HALL:  Your Honor, we have supplied you, I think,

3  with a copy of these Exhibits 1 through 14.  It should be in a

4  Redweld.

5      THE COURT:  This one -- I didn't see these earlier; so

6  if I appear not to be listening --

7      MR. HALL:  You'll be scanning the exhibits.

8      THE COURT:  -- I'll be reading it now.

9      MR. HALL:  Your preference, Judge.  Do you wish me to

10  hold up until you have an opportunity -- I'm going to go

11  through them individually, but very quickly; or would the Court

12  prefer that I just simply continue the examination?  These are

13  the invoices that are going to identify specific equipment that

14  we purchased --

15      THE COURT:  Get him to answer that question.  What is

16  it?  19 pages?

17      MR. HALL:  No, Judge.  It's a little bit more than

18  that.  I think it's 30 pages.  What I'll do is quickly -- I

19  think within five minutes I can cover all these pages.

20      THE COURT:  Well, the question is not how many they are

21  or even what they cover.  The question is:  Do you need them?

22      MR. HALL:  I think because of exhibits that they've

23  already tendered that they are going to be offering their whole

24  issue is whether we own the system and I choose to prove for

25  the Court that these are invoices that show what we own that

1    they have even sworn in this lawsuit some of them they're

2    claiming that they own and this is a case of conversion and

3    misappropriation of computer assets and that's why I think it

4    would be necessary to at least show the foundation of our

5    ownership.  That's what the intent here is.

6              THE COURT:  The first question that can be done fairly

7    quickly is:  Who has to continue the relationship until there's

8    a reasonable time to reorganize?

9              MR. HALL:  Exactly.  And, Judge, our plea to you is

10   going to be that since this is a -- this is mischief of

11   conversion that the defendant should bear responsibility of

12   allowing enough time for us to correct the conversion and

13   resume control over our system.  But we're willing to pay them.

14             THE COURT:  All right.  How many major computers are

15   there that are devoted to this company and that company in the

16   same ocean?

17             THE WITNESS:  Your Honor, there are over 300 servers

18   that comprises the computer network.  There are also networking

19   devices such as firewalls and routers and switches that is part

20   of the computer network.  And then the other major component is

21   the hardware that actually stores and secures the data.  Those

22   are the three major components that we are asking for.

23             THE COURT:  But they plug into something else that

24   plugs into something else?

25             THE WITNESS:  Yes, sir.

1    BY MR. HALL:

2    Q.   So is this a situation where you can just take servers

3    and --

4         THE COURT:   That's leading.   Come on.

5         MR. HALL:   Okay.   I was trying to expedite, Judge.

6    I'll go back to my what, when and where.

7    BY MR. HALL:

8    Q.   Would you tell the Judge:   What are Exhibits 1 through 14?

9    A.   Your Honor, Exhibit 1 represents the purchase by W&T

10   Offshore of various components that reside in our data center.

11   Q.   Do you have more than one of these invoices, or do you

12   have other invoices showing similar purchases?

13   A.   We have multiple invoices.

14   Q.   So that is just an exemplar?

15   A.   Exactly.

16   Q.   All right.   What's Exhibit 2?

17   A.   Exhibit 2 shows the purchase of our HP storage device.

18   It's called an HP Nimble.   This is our primary and secondary

19   storage devices that stores all of our data, our seismic data.

20   Q.   Let me ask you, though:   As to that Exhibit 1 have the

21   defendants filed a sworn answer to discovery in this case

22   claiming they own the item that you-all purchased in Exhibit 1?

23   A.   Yes, they have.

24   Q.   Is that a true statement or not on their part?

25   A.   Yes, it is.   No, it's not a true statement on their part.

1    Q.    All right.  You've identified --

2          MR. GIBSON:  Your Honor, I would object.  I'd like to

3    see the statement.  I don't believe we've made any statements.

4    In fact, we just answered yesterday.

5          THE COURT:  Put that on hold and move on.

6          MR. HALL:  Your Honor, just for the record, it's their

7    answer to Interrogatory No. 1.

8    **BY MR. HALL:**

9    Q.    Exhibit 3.  Would you tell the Court quickly --

10         MR. HALL:  And, Your Honor, for the record, this is an

11   AEO document.  There's a confidentiality agreement that says:

12   "For Attorneys' Eyes Only."

13              This is a document that the defendants are

14   complaining that Mr. Haynes should not see.  They have taken

15   the position the chief information officer of our company

16   cannot see Exhibit 3.  I don't know if it's appropriate for me

17   to ask leave so that he can at least testify to what this

18   document is --

19         THE COURT:  Just ask him:  "What is that?"

20         MR. HALL:  Okay.

21   **BY MR. HALL:**

22   Q.    What is Exhibit 3?

23   A.    Exhibit 3 is a breakdown of the hardware that resides in

24   our data center on our platforms that the defendant is claiming

25   he owns.

1    Q.    And does W&T own that information -- those items?

2    A.    Yes, they do.

3    Q.    All right.  Go to Exhibit 4, please.

4          MR. GIBSON:  Your Honor, if I may, there was a hearing

5    at the state court level before the removal where the

6    plaintiffs specifically asked to show our AEO documents that

7    was denied by the state court.

8          THE COURT:  It should have stayed.

9          MR. GIBSON:  I understand.  But the rulings made by the

10   state court on discovery issues do come with us is my

11   understanding for the process of removal.

12         THE COURT:  Well, there are no really federal -- the

13   rules are getting it in and out; but if you touch it, nobody

14   else can touch it.  This is not a game.

15              I think both of you ought to call the banks in

16   Midland.  I bet you they show the number of gas wells that are

17   going, the price of gas, the price of oil instead of community

18   stuff.  Well, that is -- that's what people want to know.

19              Essentially I'm not burdened by what was said to

20   people in state court.  If it's against their interests, that

21   can be admitted for that purpose.

22   **BY MR. HALL:**

23   Q.    Exhibit 3 that we've just gone through, would you tell --

24         THE COURT:  Does that say:  "AEO 3"?

25         MR. HALL:  Exhibit 3 is AAIT 000071.  That would be

1    Exhibit 3, Your Honor.

2          THE COURT:  Does it say, "AEO" on it?

3          MR. HALL:  It does.  I think it's marked at the

4    bottom, Your Honor.

5          THE COURT:  Twice.

6          MR. HALL:  It does.

7          THE COURT:  But I just want to make sure we're talking

8    about the same thing.

9          MR. HALL:  That's what we're talking about.

10   **BY MR. HALL:**

11   Q.    All right.  Exhibit 4.  Would you tell the Court what that

12   is, please.

13   A.    Exhibit 4 is an invoice billed to W&T Offshore for

14   software that supports those operating systems and computers

15   that reside in our data center.  It's specifically for

16   maintenance and support of the software.

17   Q.    Did W&T pay for that?

18   A.    Yes, we did.

19   Q.    And is AAIT claiming it also?

20   A.    Yes, they are claiming ownership of it.

21   Q.    Again Exhibit 4 is just an exemplar of many invoices

22   showing that?

23   A.    Correct.

24   Q.    Exhibit 5, tell us quickly, please, what that is.

25   A.    Exhibit 5 is once again an invoice billed to W&T Offshore

1    which was paid by W&T Offshore for the backup software which

2    backs up our data to the hardware in our data centers.

3    Q.    Again is this just an exemplar of something that you

4    purchased --

5    A.    We purchased it, correct.

6    Q.    -- and AAIT is claiming to own?

7    A.    Yes.

8    Q.    Exhibit 6, would you tell us what this reflects?

9    A.    Exhibit 6 represents the rent that we pay to CyrusOne,

10   which is the data center in Austin, Texas, on a monthly basis.

11   This is billed to W&T Offshore and paid for by W&T Offshore.

12   Q.    And this is where your actual backup system is located?

13   A.    In Austin data center, yes.

14   Q.    How frequently do you make this payment?

15   A.    On a monthly basis.

16   Q.    And are you allowed now -- as W&T are you allowed by AAIT

17   or CyrusOne to go into the center y'all are paying for?

18   A.    No, we're not.

19   Q.    You can't go into the backup.  So how about the primary

20   system?

21   A.    We cannot enter.

22   Q.    Who is foreclosing or preventing you from doing that?

23   A.    AAIT.

24   Q.    Exhibit 7, would you tell us what that is.

25   A.    Exhibit 7 represents another invoice billed to

1    W&T Offshore and paid for by W&T Offshore for the help desk

2    software which is used to manage the incidences and support our

3    user community.  This was paid for by W&T, and we own this

4    software.

5    Q.    All right.  Is this software necessarily for your

6    operations?

7    A.    This is necessary because it keeps track of the incidences

8    and the problems within the computer environment.  This is also

9    used to support our Sarbanes-Oxley reporting on a quarterly

10    basis.  We provide reports out of that software to our external

11    auditors Ernst & Young.

12    Q.    Do you have any control over that?

13    A.    No, we do not.

14    Q.    Who is preventing you from having access and control?

15    A.    AAIT.

16    Q.    Would you tell us what Exhibit 8 relates to.

17    A.    Exhibit 8 is for the purchase of a Palo Alto firewall, one

18    of the security or networking devices that is a critical

19    component of the network.

20    Q.    What does it do?

21    A.    It's like a traffic cop.  It controls traffic in and out

22    of the network.  It secures the network.

23    Q.    Is this a physical device, or is this virtual?

24    A.    This is a physical device.

25    Q.    Where is it located?

1    A.    In one of the data centers.

2    Q.    Have you had access to it?

3    A.    No, we have not.  We've requested access, but he hasn't

4    granted us access.

5    Q.    Is AAIT exercising dominion and control over this Palo

6    Alto device?

7    A.    Yes, they are.

8    Q.    To the exclusion of W&T?

9    A.    Correct.

10   Q.    Would you tell us what Exhibit 9 relates to.

11   A.    Exhibit 9 represents the purchase of different security

12   appliances, Cisco Meraki firewalls that are either on our

13   platforms or in our data center.

14   Q.    And what does this do?

15   A.    It's similar to the Palo Alto firewall.  It controls

16   traffic in and out of the network and provides security of data

17   and training traversing the network.

18   Q.    Again, do you have any access to this?

19   A.    No, we do not.

20   Q.    Have you asked for AAIT to permit you to have access and

21   control?

22   A.    Since Day 1, yes, I have.

23   Q.    Have they declined?

24   A.    They have.

25   Q.    Exhibit 10, would you tell us what that relates to,

1    please.

2    A.    Exhibit 10 relates to thin-client computers that sits

3    either on a user's desk or on the platforms in the Gulf of

4    Mexico.  This represents the purchase of 105 of those devices

5    billed to W&T and paid for by W&T Offshore.

6    Q.    What is a thin -- what did you call it?

7    A.    Thin client.  It's a standard desktop computer.  It's just

8    a small form factor of a computer.

9    Q.    All right.  And these are physical devices that are

10   actually on the platforms?

11   A.    And in corporate offices and field offices as well.

12   Q.    Are they necessary for your operations?

13   A.    Yes, they are.

14   Q.    Why are they necessary?

15   A.    This is what our users use own a daily basis to provide

16   inputting to the computer systems, to generate invoices, to

17   communicate with vendors.  It's a tool that's used on a daily

18   basis to perform their job function.

19   Q.    Would you tell Judge Hughes how many of these devices have

20   you-all purchased?  And by "you-all" I mean W&T.

21   A.    Well over 200.  This is only one invoice for 105; but

22   since I've started, I've seen invoices for at least 50

23   additional computers.

24   Q.    And is AAIT now claiming they own these things -- what did

25   you call them?

1    A.    Thin clients.  Yes.  Computers, yes, they are.

2    Q.    Have they given those back to you?

3    A.    The ones in our corporate office, we have access to those;

4    but the ones on the platforms, they're claiming ownership of

5    those.

6    Q.    How many are they claiming -- exercising dominion over to

7    the exclusion of W&T?

8    A.    All except 39.  They claim that W&T only owns 39 of these

9    devices.

10   Q.    Exhibit 11, would you tell us what that relates to.

11   A.    This is our --

12         THE COURT:  Can't we rule that the rest are similar?

13         MR. HALL:  This is -- those were computer

14   communications.  This is audio, like the telephone service.  If

15   they'll stipulate that --

16   **BY MR. HALL:**

17   Q.    We can't control our telephone service or our cable

18   service; is that right?

19   A.    That is correct.  Your Honor, we --

20         THE COURT:  Mr. Gibson?

21         MR. GIBSON:  We've been trying to turn over their data

22   to them for six weeks, so I won't stipulate that they can't

23   have access to their own computer.  We've been asking them to

24   take --

25         THE COURT:  All right.  What is involved in doing that?

1          MR. GIBSON:  So that's a great point.  For six

2     months -- six weeks ago, Your Honor, if I may.

3          THE COURT:  Kick anything that's in your way.

4          MR. GIBSON:  Thank you, Your Honor.  Can you hear me

5     better now?

6          THE COURT:  Yes.  Thank you.

7          MR. GIBSON:  Six weeks ago, as the witness has stated,

8     the parties -- as the witness has stated, the parties mutually

9     asked each other effectively to stand down and not provide each

10    other services.  They told us they didn't want to work with us

11    anymore, and we issued a form termination giving them 30 days

12    to do the transfer process.  We have offered them a contract if

13    they want to do it on a day rate to continue our services

14    moving forward.  They don't want to pay it.  All they want to

15    do is to hire lawyers to force us to do a contract --

16         THE COURT:  Don't.

17         MR. GIBSON:  To answer your question, Judge, before I

18    get into the arguments, what is required?  So we have -- we

19    stand ready today, just like we did six weeks ago, to transfer

20    all their data to them.  The documents that they're showing --

21         THE COURT:  And the machines housing it?

22         MR. GIBSON:  The machines.  I'll give them everything.

23    If they have an invoice -- if they have an invoice that they

24    purchased the device, we'll turn it over; and I can turn it

25    over probably -- I can turn it over -- if this wouldn't have

1   happened so late in the day, I could have done it today or

2   tomorrow.  We don't have any interest in keeping their devices.

3          THE COURT:  Seems unlikely, but --

4          MR. GIBSON:  Six weeks ago we offered to do that very

5   thing.  But your question --

6          THE COURT:  That doesn't always stop people from doing

7   irrational things, especially if they're in your family.

8          MR. GIBSON:  So what needs to happen is they need to

9   tell us a repository, a location -- a virtual location where

10  they want all their data sent.

11              Well, we asked for it on June 24th -- or

12  July 24th; and they still won't tell us where to send it.  We

13  have it in a physical device, what they're calling their backup

14  server.  We could put all that data on it and hand it over to

15  them as well, but they don't want it.  They won't tell us where

16  to send it.

17              And so it's just that we've canceled our

18  contract.  We don't have a contract with them.  There's no term

19  anymore.  We're trying to deliver their data to them, and they

20  won't take it.  If they will identify -- in fact, the documents

21  that they're using right now --

22          MR. HALL:  I'm sorry, Judge.

23          MR. GIBSON:  Mr. Hall --

24          THE COURT:  Wait, wait.

25          MR. HALL:  This is argument, Judge.

1          THE COURT:  What?

2          MR. HALL:  I object.  This is argument.  He's

3     arguing --

4          THE COURT:  It is, but maybe he'll step on something.

5          MR. GIBSON:  The documents that Mr. Hall is using with

6     the witness, they never produced to us.  We've never seen

7     those.  If they would have given those to us and said, "This is

8     our device.  Please deliver it," they'd have that device

9     already.

10          There's no need for an injunction.  We're happy

11     to turn over all their property.  And I have a contract, when

12     it's my turn to talk, that shows that we have a license from

13     them signed by their CEO to build our network that we use to

14     service our customers in the Gulf.

15          You see, you can't have internet -- you know this

16     from your experience in IT.  You can't have a network in the

17     Gulf like you can here.  You can't call AT&T to get your

18     internet.  What they actually use, Your Honor, is the platforms

19     themselves as nodes, jumps; so if you -- that way we can put

20     hardware on a platform to communicate with the nearest platform

21     and then we communicate with the nearest platform after that.

22     That's how you build a network out in the water.

23          So we have a deal with them, a contract, a

24     written contract they haven't presented in their papers.  I

25     brought it with me.  It says that we have a license on their

1    platforms to build our networks to service both WT and service

2    our other customers.

3         THE COURT:  I'm not worried about that.  They're either

4    yours or they're not.

5         MR. GIBSON:  I'm with you, and I've got a list of every

6    document that they've given us where we've identified a piece

7    of hardware that they asked us to purchase for them.  I'll turn

8    over everything on that list.

9              So I guess your question was, Your Honor, what is

10   it going to take?  This should have been done weeks ago, and

11   that's our point.

12        THE COURT:  People are inventively stubborn, and court

13   rules and lots of laws are built for a different age by

14   probably one 75-year leap, at least one.

15             So I may have to extend the temporary relief

16   because I don't have enough time to help you disentangle, but

17   not long, because I don't like to baby-sit.

18        MR. GIBSON:  I could present one exhibit, I think, that

19   may help.  We made an offer to W --

20        THE COURT:  No, I don't want to know about it.  That

21   didn't work.

22        MR. GIBSON:  Well, I just said for the bond -- and what

23   will happen over the next 14 days, we have a contractual offer

24   that we made to them that we will do this work on a day basis.

25   And so if it does need to extend --

1    THE COURT:  If you'll describe what the costs are and

2    what a normal commercial fee would be, not necessarily him --

3    and you can bill me all you want.  The government doesn't play

4    fair, even our distinguished judicial branch.

5         His needs -- his needs -- sound relatively easy

6    to do.  Now, there's a lot to do them.  Lots of stuff sounds

7    easy, but it's not.

8         And so exactly what they're claiming is theirs

9    and how they would like it disentangled and sent somewhere else

10   or sent back to Houston, they are very interesting problems.

11   That way, you'll have a judge-monitored transfer of the stuff,

12   which in all likelihood they own, at least the first 387 last

13   month purchase orders.  So we can do that.  You've got somebody

14   over there who can help you.

15        Thank you, ma'am.

16        We could have an agreed temporary restraint for

17   45 days.

18        MR. HALL:  In fact, Judge, if I may be heard, since

19   Mr. Gibson suggested to you his proposal to us, what we have

20   proposed to him is the following:  That we will disentangle --

21   if that's the proper word to use -- from one another, have the

22   Court appoint a neutral computer expert just to monitor the

23   transfer, so make sure everybody is playing fair.  We will pay

24   for that monitor.  We don't care who that is.  You can select

25   that person.  We've both given candidates.  They've given

1    Gregg Costa as a neutral.  We've given --

2           THE COURT:  I don't know who that is.

3           MR. GIBSON:  Former Fifth Circuit judge.

4           THE COURT:  Pardon?

5           MR. GIBSON:  Judge Costa, Gregg Costa of the Fifth

6    Circuit.  He's with Gibson Dunn now.  He's left the bench, and

7    he's in private practice.

8           THE COURT:  Where was he?

9           MR. GIBSON:  He was at the Fifth Circuit, Your Honor.

10   Judge Gregg Costa.

11          THE COURT:  Oh.  That's why I don't know his name.

12          MR. GIBSON:  The problem we have is with their

13   proposal.

14          MR. HALL:  I wasn't finished.  I'm sorry.  If I may.

15              Judge, we will pay for the neutral if the Court

16   wants to do that.  That way we're not coming back and you're

17   having to monitor us, and it will just give us a window of time

18   so we can have enough time.  We can't just take equipment.  We

19   have to take an operational system --

20          THE COURT:  I know that.

21          MR. HALL:  I'm sorry, Judge.

22          THE COURT:  But you've got to get going.

23          MR. HALL:  That's exactly right, and we're ready to get

24   going.

25          MR. GIBSON:  And I guess the problem we have -- an

1    injunction -- it's hornbook law according -- in the state of
2    the Texas.  You can't have an injunction that forces someone to
3    do personal services.  You can't perform a service contract by
4    injunction and --
5        THE COURT:  This is not going to be an injunction.
6    It's going to be a judgment that your client loses if you're
7    stubborn.  This is not a playpen.  It's not yours, give it
8    back.  We do that in maritime cases all the time.
9        MR. GIBSON:  Your Honor, we'd give it back today if
10   they'd let us.  They won't -- they won't take it.  They won't
11   take it.
12       THE COURT:  Well, I'll find a repository.
13       MR. GIBSON:  Okay.  And we will put everything there,
14   Your Honor.
15       MR. HALL:  Judge, the issue is not that we don't have
16   any place to store it.  The problem is they won't even give us
17   the passwords so we can transfer data before they ever transfer
18   the machinery.
19       THE COURT:  All right.  How long does it take you for
20   you to transfer the passwords?
21       MR. GIBSON:  Well, the passwords they want are to our
22   network.
23       THE COURT:  To our what?
24       MR. GIBSON:  To our network.  We have a network that we
25   service our customers.  We will copy the data for them.  We

1  know where their data is, but I won't give them -- and I can do

2  it -- I think we're already done.  I think I'm ready to

3  transfer their data.  If they will tell us where to put it, we

4  will transfer it.  Give me --

5          THE COURT:  So --

6          MR. HALL:  Can you --

7          THE COURT:  No.

8          MR. HALL:  -- do it in 48 hours?

9          MR. GIBSON:  We can do it in 48 hours.

10         THE COURT:  You're spitting in the soup.  Don't do

11 that.  I'm trying to get you somewhere, and you keep thinking

12 of something else.

13              If anybody has something that needs saying, it's

14 you.

15         THE WITNESS:  And I would like to say, Your Honor,

16 Your Honor, they've offered to transfer data.  This is more

17 than just about data.  This is an entire operational network

18 that includes servers, firewalls, routers, switches, not just

19 data; and the data alone does not represent an operational

20 network.

21         THE COURT:  I understand.  But it's never going to

22 improve, probably might even stay the same because it ages in

23 their hands; and the reasonable thing to do -- you made a lot

24 of money off of this deal, and I think y'all got it

25 cross-purposes, which happens.  But that data is losing ground.

1   Life doesn't stand still and I don't know and you don't know
2   what you have to do to get that stuff.  He does.  Or if he's
3   not the secret guru of this stuff, he knows who to talk to to
4   get it done.  But it needs to be done fast.  It's to
5   everybody's detriment to postpone it; and it will seem strange
6   at this juncture, but it's true.
7             You might have a wonderful future together after
8   a cooling-down period and they strike 187 more wells, it may be
9   a good deal.  Many business suits are shooting themselves in
10  the foot.
11            MR. HALL:  Judge, if I may ask, if we can't reach
12  agreement -- and I'll go out in the hallway and talk with
13  Mr. Gibson -- what we'd ask the Court to give us is a 60-day
14  window.
15            THE COURT:  Counsel --
16            MR. HALL:  Yes, Judge?
17            THE COURT:  -- we've done that.  I'd like to give you
18  120 days.  I don't know.  But every day that they're occupied
19  with this is a day less they can occupy themselves with the
20  business that remains.
21            MR. HALL:  Exactly.
22            THE COURT:  So it's got to be balanced.  It's not going
23  to be easy for him to get together.  It's not going to be easy
24  for him to get rid of it.  It's just a chore.  It's a lot of
25  work, but it needs to be done and it needs to be done promptly

1    by professionals.

2              Do you want to talk to your man?

3         MR. GIBSON:  Yes, Your Honor.  I mean, the parties were

4    set -- before this hearing was set, we were going to sit down

5    and we were going to try to mediate, because I'm a big fan of

6    that from our perspective, because our clients know their

7    businesses a lot better than the lawyers do and the Court does

8    and so I guess I'm concerned about --

9         THE COURT:  I disagree with that.

10        MR. GIBSON:  Okay.  Maybe not the Court.  I'll give you

11   that.

12        THE COURT:  Some other judge.

13        MR. GIBSON:  Some other judges.

14             So I think at a -- I think at most the law would

15   require that the TRO be issued for a 14-day period.  I'd like

16   to put on evidence of what I think the bond should be if we're

17   going to do that and then at least have the parties

18   negotiate and see if there's something they can --

19        THE COURT:  Counsel, don't take 30 days.  You know

20   their finances.  You've been in business with them for what?

21   15 years or something?  This is not a profit.

22        MR. GIBSON:  Your Honor, we're trying to get away from

23   the contract.  We don't want to be involved, and we're not

24   trying to make money off of it.

25        THE COURT:  At the moment you don't; but when they make

1    a lot of money, you'll remember them fondly.

2           Mr. Hittner?

3        MR. HITTNER:  Your Honor, the problem here is we were

4    scheduled to go before the state judge.  They removed.  We had

5    a deposition set.  They're now saying, "Whoa, whoa, whoa, whoa,

6    whoa.  Maybe we shouldn't have done this."

7           But quite frankly we're happy to work it out; but

8    they need to stop thinking they're going to one-up us and find

9    a way to get us our data, get us our equipment.  And they're

10   the ones that removed, and now he's saying, "14 days."  No.

11       THE COURT:  I don't know what that personal service

12   thing was; but when I tell a company to do it, it's the

13   owners and the employees who get the work done.  Now, that

14   was -- that was not very lawyerly.

15       MR. GIBSON:  Well, I think if the argument is that we

16   should deliver it, we will deliver the data by end of day

17   tomorrow.  I can deliver the data; I can deliver the devices.

18   If that's what they want, we can do it.

19           It's just that we don't -- we don't believe it's

20   appropriate for the parties to be ordered to continue to work

21   without a contract that requires us to do it.  We don't have a

22   contract that requires the continued operations --

23       THE COURT:  You've got a contract not to keep property

24   that belongs to somebody else.

25       MR. GIBSON:  Like I said, they gave us -- they've never

1  given us these documents.  Now that I have them, I will turn

2  this over.  I'll turn it over -- I'll turn it over tomorrow.

3          THE COURT:  Your people knew which leader is on which

4  platform and who paid for it.

5          MR. GIBSON:  Correct.  But the devices --

6          THE COURT:  You just never thought it would be very

7  interesting.

8          MR. GIBSON:  Your Honor, on July 24th we offered to

9  return those -- those devices.  There's a 700,000-dollar --

10          THE COURT:  You're reverting to that.  Quit whining.

11              Who's the head person?

12          MR. GIBSON:  This is Ramesh.

13          THE COURT:  Do you know where the jury room is?

14          MR. GIBSON:  In your courtroom, Your Honor, no, I do

15  not.

16          THE COURT:  Good.  If you'll follow him -- this is his

17  third day here, so I'm not sure he can find it.  Go out this

18  door and follow him with him and you.

19          MR. GIBSON:  Okay.

20          THE COURT:  Actually since it's been represented and I

21  believe it's gospel she knows it all, take her along, too.

22          MR. GIBSON:  Is it for the parties to have a

23  conference, Your Honor, or just on our side to confer?

24          THE COURT:  You ought to talk among yourselves.

25          MR. GIBSON:  Okay.

```
1            THE COURT:  People are nervous when they talk around
2    me.  You may take a rest.
3            MR. GIBSON:  Thank you, Your Honor.
4            THE COURT:  Just let the parade go by.
5                 Does anybody need to go to the restroom?
6                 (Brief pause in the proceedings.)
7            THE COURT:  Illumination?
8            MR. GIBSON:  I do believe it was very illuminating.  It
9    gave me an opportunity to talk to my client about the testimony
10   that was heard.
11                We disagree about a lot of the factual components
12   that were provided.
13           THE COURT:  Okay.  So do I.
14           MR. GIBSON:  Okay.
15           THE COURT:  How much is the check going to be for doing
16   all that work?
17           MR. GIBSON:  Well, so we can do the work for 250 per
18   day per platform that they want us to monitor and maintain and
19   so that's my understanding.  That's market rate.  I'm happy to
20   put Ramesh on to provide testimony on that number.
21                But if they want us to do a hundred platforms,
22   it's cheaper.  As they migrate away, that price comes down as
23   you point -- and that creates the incentive I think you're
24   looking for, Your Honor.  The faster you migrate, the cheaper
25   it gets because --
```

1      THE COURT:  That's the sort of thing -- most of my oil

2  field work was either listening to my father who was in

3  hydro -- my jobs in the oil field were exquisitely low.  When I

4  reported, I was astonished they still had things like that,

5  but it was the best job I could get.

6              There's an echo from my father.  The morning I

7  turned 14, my mother was still in bed so surprised that I lived

8  that long thinking somebody surely would have shot him by now;

9  and I plopped down next to my dad and said, "Good morning,

10  sir."

11             And he said, "Good morning, Lynn."  There was a

12  pause.  Oh, he said, "Happy birthday."  And then a short pause

13  and he says, "Where are you going to work?"

14             And I said (Stuttering).

15             And when I took a breath, he said, "Well, it

16  seems to me you have two choices.  You get a job, you'll have

17  money.  You don't get a job, you'll work for me; and I won't

18  pay you."

19             I learned a lot in that 28 seconds because I

20  immediately said, "I'll get a job, sir."

21             And he said, "I thought you would."  And that's

22  the end of it.

23      MR. HITTNER:  Your Honor, if I may?

24      MR. GIBSON:  One more thing I'd like to add.

25             I believe we can have all the devices and data

1  delivered by Friday of next week as well.  I guess if they do

2  the contract, of course, and they are paying us a per day rate,

3  they can tell us when they want delivery.  They can tell us

4  when they want the data.

5        At that point it takes a lot of the pressure out

6  of the room because we have the rate we believe is adequate for

7  us to maintain staffing on our end.  Because you have to send

8  people out to platforms.  I mean, it's not --

9        THE COURT:  Some of it is not a system.  Some of it is

10  local to the rig or whatever or the home office.  I don't know.

11        MR. GIBSON:  That's why if we'd had the opportunity --

12  if we have another hearing, we'll present the contract that

13  lays out the reason we built networks at each of their

14  platforms that they're communicating through and that's why

15  it's going to become thorny and we're going to have to go

16  invoice by invoice to figure out what's theirs and what is

17  ours.

18        And so what we can offer -- and I think it's a

19  fair market rate -- $250 per platform per day they want us to

20  support.  That's a fair rate for us.  We can keep the lights on

21  on our end from doing it.  It takes the pressure out of the

22  situation because at that point we're there to support them and

23  we're their transition team and then, like you mentioned, maybe

24  we can all get along one day down the road.

25        THE COURT:  Or split up.

1      MR. HITTNER:  Your Honor, if I might, they're currently

2   making about -- about -- $10,000 a day, $300,000 a month.

3              The price structure that --

4      THE COURT:  Wait a minute.  Why do I care about that?

5      MR. HITTNER:  Well, the price structure he's proposing

6   would take that $10,000 a day up to $30,000 a day to

7   transition.  And this is our equipment.  This is the --

8      THE COURT:  Okay.  I've got that.  So what does your

9   client recommend for the pricing for removal?

10     MR. HITTNER:  I'm happy to make a counterproposal,

11  Judge; but this is akin to --

12     THE COURT:  Well, make it.

13     MR. HITTNER:  Our position is that they should continue

14  making what they made before trying to steal all of our

15  equipment --

16     THE COURT:  Okay.  I got it.  I know you think I'm

17  slow.

18     MR. HITTNER:  No, no, not at all, Judge.

19     THE COURT:  Mr. Haynes?  How about you?

20     MR. HAYNES:  I would say -- I'm sorry, Your Honor.

21     THE COURT:  We've worn you out.

22     MR. CURTH:  Oh, me?

23     THE COURT:  Somebody give him a name.

24     MR. CURTH:  Jonathan Curth, Your Honor, general

25  counsel.

1          Well, look, taking it -- what is that?  Three,

2    three and a half times.  I mean, look, we want to be

3    reasonable.  We want our data and equipment.

4          I mean, look, 20, 25 percent markup seems more

5    than fair; but if we -- we're willing to negotiate.  We want to

6    be reasonable.  I'm not sure three times is reasonable.

7          THE COURT:  How have you done the last 90 days?

8          MR. CURTH:  It has not been 90 days, but what we've

9    done previously is we have been preparing to have to build out

10   our own network if we have to, an exorbitant amount of money

11   and we've already bought --

12         THE COURT:  Can your people who are on the payroll

13   remove these things and transfer the data?

14         MR. CURTH:  No.  No, I wouldn't put it that way.

15         THE COURT:  Okay.  I don't know.

16         MR. CURTH:  I mean, look, I'm not an IT person; but as

17   I kind of understand this, the bulk of this equipment is

18   sitting in a storage unit and so, fine, they own -- they rent

19   the storage unit.  Just roll the stuff out and move it next

20   door.

21         So it's -- it's -- as soon as we can get the

22   passwords and the access, I think we can have this done in

23   under 30 days.  And we want to move away, and we're willing to

24   pay a premium.  I'm not sure 300 percent is reasonable.  We're

25   willing to do something more.

1           THE COURT:  All right.  Just because I don't have the

2    background that you-all do, but you're saying that you want to

3    disconnect the things --

4           MR. CURTH:  I'm saying we want to take our equipment

5    and move it to our house.

6           THE COURT:  And is that more expensive than letting it

7    rest temporarily in W&T's warehouse?

8           MR. CURTH:  You mean AAIT's.

9              I can't really speak to that.  It's probably

10   similar.  I mean, we're willing to -- if you think --

11          THE COURT:  I think the man behind you is thinking real

12   hard.

13          MR. HAYNES:  Your Honor, I believe we own the space

14   that the equipment currently resides in.  We pay that invoice

15   on a monthly basis to the tune of $13,000.  It is billed to

16   W&T.

17          THE COURT:  You don't own it?  You've leased it?

18          MR. HAYNES:  Yes, we lease that space; and we pay for

19   that space.

20          THE COURT:  I mean, if you just pay for it every month,

21   that's a lease.

22          MR. HAYNES:  Correct.  If we have access to that space

23   and to our equipment, we are willing to move that equipment

24   away from the other commingled hardware and move it away from

25   AAIT and take it to our own data center.  That's our ultimate

1    goal.

2            THE COURT:  And that's in Houston.

3            MR. HAYNES:  That is in Houston in Katy, Texas,

4    correct.

5            THE COURT:  Where is it right now?

6            MR. HAYNES:  It's also in Houston at a different data

7    center.  There are many providers of different data centers in

8    Houston.

9            THE COURT:  Okay.  So you're talking about crossing a

10   couple of roads.  I can hire some teenagers.

11           MR. GIBSON:  I mean, we'll bring it over.  I think

12   we've already delivered one of the servers.  I have a

13   photograph of one of the servers at their office and so --

14           THE COURT:  But I want it all done.

15           MR. GIBSON:  Yeah, like I said --

16           THE COURT:  All right.

17           MR. HAYNES:  Your Honor, if I may speak?

18           THE COURT:  Yes, sir.

19           MR. HAYNES:  The transition has to be a very orderly

20   process.  You just can't remove the equipment and deliver it.

21   The network needs to stay alive.  It needs to continue to

22   function.

23           THE COURT:  Okay.  But there are a whole lot of boxes

24   that aren't connected to anything at the moment as I understand

25   it.

1      MR. HAYNES:  Everything is connected, correct.

2      THE COURT:  You're going to look funny towing that

3  warehouse down the street.  Your client --

4      MR. GIBSON:  It could be collateral.  We have a photo

5  of -- we actually delivered one of their servers to them.  We

6  have a photo of it delivered, but I mean, I don't think it

7  matters at this point because it sounds like -- look, we have

8  an offer to them.  If they want our services, if they want a

9  day rate for us to support them, we've got --

10     THE COURT:  If not, you get them.

11     MR. GIBSON:  Right.

12     THE COURT:  And you have somebody watch because I don't

13 want to hear a complaint later that they took the east wall

14 instead of the --

15     MR. HITTNER:  Your Honor, I think --

16     THE COURT:  Oh, thank you for volunteering.

17     MR. HITTNER:  I think we'll need some guidance from

18 Your Honor.  They are at a 3X rate, and we have said that we

19 will be flexible.  We think that's a little outrageous.

20     THE COURT:  Don't tell me about what you're going to

21 be.  We've got a number.  You don't like their number, give

22 them a new one or, as I understand it, he wants to do it all

23 himself.

24     MR. HAYNES:  Your Honor, I do not necessarily need

25 their assistance to transition the network, but I do ask that

1  they continue to support it during that transition and we're

2  currently paying on a monthly basis for that support.

3  THE COURT:  All right.  Well, we subtract that when you

4  pay some other number.

5  MR. CURTH:  And correct me, but I think we're

6  approximately paying 300,000 a month; so if we paid half a

7  million a month until this is done, is that reasonable?

8  MR. GIBSON:  Yeah, I mean the reason that we broke it

9  down per server is so that we can begin scaling down; and so I

10  think it makes sense to say -- if 200 is the right number, I

11  think 200 per server per day or platform -- it's a platform.

12  It's in the water.  This is not someone's home computer.  I

13  think that's a fair price, and I have to get approval.

14  Ramesh, are we okay with 200?  200 per platform

15  per day?

16  MR. ARUMUGAM:  Yes.

17  MR. GIBSON:  Okay.  We could do that, Your Honor.

18  THE COURT:  See?  I think you can work it out, but -- I

19  don't know.  You may find it unpleasant or not, but this is

20  simple.  And both sets of people have been active contributing

21  members of a large society that produces something Putin

22  doesn't and so you've got to get those back in service.

23  MR. GIBSON:  I have a proposal, and this is --

24  THE COURT:  Pardon?

25  MR. GIBSON:  Let me stick my toe out here, but I have a

1     proposal.

2              If we could -- I think the parties were planning

3     to sit down and negotiate a workout, like I mentioned.  If the

4     TRO is still in place until tomorrow, until tomorrow at

5     midnight, does the Court have a window tomorrow that it could

6     rule if the parties are unable to sit down and meet and have a

7     grownup conversation about this and see if we can get through

8     it?

9              (Off-the record discussion.)

10             MR. HITTNER:  Your Honor --

11             THE COURT:  Yes, sir?

12             MR. HITTNER:  Your Honor, they waited until the

13    eleventh hour.

14             THE COURT:  Okay.  And they're rotten skunks.

15             MR. HITTNER:  But they're now asking -- so we scrambled

16    and we did what we had to do to be here today and now they're

17    asking this court not to rule on everything we've had to do to

18    meet their -- what they've put before us.  We don't want, you

19    know, to risk all of these platforms going out.  They're now

20    asking for you not to rule on --

21             THE COURT:  I'm not going to rule on it.  I'm going to

22    tell you what I expect you to do tomorrow, which is push this

23    along.  If any of you are having emotional problems because of

24    the way this is aligned, then go watch a movie or something.

25    We're not here to play games.

1      I had a couple of lawyers who stood right there

2  and just fussed and told me what a rotten scoundrel they are.

3  I just finally, I said, "Thank you so much, gentlemen.  I now

4  accept their stipulation that they are both SOBs."

5      I mean, if you ever watch the jury when lawyers

6  do that, they get sick at their stomach.  That's not what

7  you-all are paid to do.

8      And my theory is I'm going to allow you to use my

9  restroom, my jury room that has two kinds of toilets or

10 restroom facilities.  It's elegant.  It has coffee with a

11 coffee maker, and I'll be here.  I'll just be here in and out

12 because I've got other impatient people.

13     But I don't believe that your client owns all the

14 stuff that they've been -- that they buy it somewhere and then

15 rent it to you or something, but it's clear that that's their

16 stuff.  You've got no use for it.  That's the biggest problem

17 with it.

18     Clean it up and work out a sensible settlement

19 because you're not going to make money off of me in this stuff.

20 You'll be lucky to break even.  I mean, it's a retro movement.

21 It's not your fault, but neither is all that other stuff that

22 happens in markets.

23     I participated in one wildcat, and it made me

24 feel so much better about all of the others.  I lost money on

25 this one, even.  You can do it.

1          We got a layer of articulate, well-prepared

2     lawyers.  That doesn't make money.  Only incidentally does it

3     happen that we make a business more of a business.

4          But at this point there's so much tension brought

5     on by problems that neither side started, y'all are dancing

6     around shooting yourselves in the foot.

7          And so I will tend to my other people.  My

8     secretary is about midway.  If she's not there, the law clerk

9     will be back where the sign says "Law clerks."  It's wrong.

10    It's only a single one at the moment, and I'm going to try to

11    find another one.

12          Anybody have any questions?

13         MR. HITTNER:  Your Honor, just so that I'm clear, we're

14    going to come back here after we've had a chance to visit, both

15    sides?  Is that correct?

16         THE COURT:  Well, I was going to give you overnight.

17         MR. HITTNER:  Is it possible that we can get a ruling

18    that the TRO will not end tomorrow?

19         MR. GIBSON:  I mean, it's really not necessary.

20    There's no --

21         MR. HITTNER:  You're not a publicly-traded company.

22         THE COURT:  All right.  I'm not sure there were grounds

23    for a TRO to begin with.  The problem is the computers, the

24    transmission lines, all of that stuff is nifty stuff, but it

25    sure takes a lot of friends to help it along.  So I don't think

1    I need it, and I don't think it's appropriate.  And so I'm not

2    going -- however, I will address anything else into a

3    short-term temporary injunction.  That way we can adjust it and

4    give you a while to see if it works.

5            MR. GIBSON:  I think if the parties will go into your

6    jury conference room, I would assume that we should be able to

7    work this out, Your Honor.

8            THE COURT:  Which two people are certain to be here?

9            MR. GIBSON:  I'm certain.

10           THE COURT:  I just need two.  The law clerk is going to

11   take you down to where it is.

12           MR. GIBSON:  May we bring our clients as well?  I think

13   it's probably better for them.

14           THE COURT:  Well, sure.  You're afraid you're not going

15   to find it?

16           MR. GIBSON:  No, I just meant the two attorneys -- an

17   attorney from our side, attorney from their side, and our

18   clients.  So I think that's what we need.

19           THE COURT:  I think one lawyer and two people from the

20   firms.

21           MR. GIBSON:  Okay.

22           THE COURT:  They're the smart people in the room.

23           MR. GIBSON:  I know, but the clients are the ones that

24   can say, "Yes, we'll do it for that price."

25                   So that's why -- I think they're the

1    decision-makers.

2              THE COURT:  No, I agree.  I started my first of many

3    spiels that they're the people who made the wealth and want to

4    preserve it.

5                   All right.  Follow this gentleman.

6                        (Court is in recess.)

7              THE COURT:  Is there an announcement?

8              MR. GIBSON:  Yes, Your Honor, there is.

9                   I guess we would start by saying we have a

10   Rule 11 agreement; however, we are missing the most important

11   component of it, which is the price.

12                  We have an offer from the plaintiffs.  We have a

13   counteroffer from the defendants.  Our plan is to read to you

14   all the material terms in the agreement otherwise for the

15   continuation of the contract under a short-term agreement and

16   then we empower you to hear our pleas as to why we believe our

17   number is correct.  You can decide our number, their number or

18   a number in between; and the parties have agreed to be bound by

19   that declaration from the Court.

20             THE COURT:  Is that the deal?

21             MR. HITTNER:  Yes, sir.

22             THE COURT:  Well, God bless you.  You did what you were

23   supposed to do.

24                  Would you take him with you?

25                  No, I'm serious.  That's the rational way to do

1    it.  Sometimes people suspect this is one of those things that

2    you see in the western movies except I'm a lousy rider.

3         MR. GIBSON:  And I'm a terrible shot.

4         THE COURT:  Huh?

5         MR. GIBSON:  I'm a terrible shot.

6         THE COURT:  I'm pretty good as a shot.  That really

7    counts.

8              All right.  The court reporter has that down.

9         MR. GIBSON:  May I proceed with the material terms?

10        THE COURT:  You're going to dictate them?

11        MR. GIBSON:  Yes, Your Honor.

12        THE COURT:  Sure.

13        MR. GIBSON:  I'm going to dictate them here and then

14   I'm going to give my opposing counsel an opportunity to make

15   sure I've dictated them correctly and then so we can have

16   everything prepared so that we can submit the issue to

17   Your Honor.

18        MR. HITTNER:  And I think we would both appreciate a

19   few moments to make our positions known on where we are on

20   price.

21        MR. GIBSON:  Correct.

22        THE COURT:  He just said you worked out everything

23   except --

24        MR. HITTNER:  Except price.  We want to give you our

25   perspective on price.

1          THE COURT:  No.  Write it down where you are.  That's

2     all I want to know.  If the answer is not settled, then I don't

3     have an answer.  You get where you want to go and keep going.

4          MR. HITTNER:  We want you to pick the number.  We just

5     want you to understand what we think, Your Honor.

6          THE COURT:  What I would like to do is, say, late

7     tomorrow afternoon if a couple of you were around we could get

8     back together.  I think you're tired and grouchy, which is in

9     some cases like judges, it's automatic.

10          I say let's get the general terms and then we'll

11     get back together and I have to put it into -- it would be not

12     late tomorrow.

13          All right.  I say go home and while some of them

14     are working on the left-hand screws, you can tell me about the

15     money part.

16          MR. GIBSON:  Well, if I could, Your Honor, can I

17     dictate into the record the terms that we've agreed upon --

18          THE COURT:  Sure.

19          MR. GIBSON:  -- so at least we don't have a moving

20     floor on that one?

21          The first term we've agreed upon is that AAIT

22     will continue to support W&T in their data transition efforts

23     for the next up to 120 days.  We have broken that down into two

24     30-day increments, which they will pay all amounts owed in

25     30-day chunks.

1        After the 60 days have passed, so two payments

2   would have been made, it will go to a seven-day increment where

3   they will renew every seven days.

4        And then at the end if they decide not to, they

5   can terminate the contract and the parties will go their

6   separate ways.

7        Upon termination of this agreement, W&T will

8   release AAIT and Secure Cloud of any and all claims it could

9   have made.

10       In addition, as to the specific steps that will

11  be performed, AAIT will allow W&T's third-party expert to have

12  access to what we call the equipment cage to remove any

13  equipment owned by W&T from that equipment cage, however W&T

14  will provide us with a plan, a transition plan, before access

15  is given to that expert.

16       The expert will agree to a reasonable protocol to

17  ensure the integrity of the data of which that expert won't

18  necessarily be accessing, but will be in the vicinity of to

19  make sure that all data is protected for AAIT's other

20  customers --

21           THE COURT:  Are we going to have one expert or two?

22           MR. GIBSON:  One.

23           THE COURT:  One?

24           MR. HITTNER:  Yes, sir.

25           THE COURT:  It's not me?

1          MR. GIBSON:  Perfect.

2          THE COURT:  Don't let my advertising fool you.

3          MR. GIBSON:  AAIT will maintain connectivity for all

4    platforms, and Secure Cloud will maintain connectivity for all

5    platforms during the lifecycle of this agreement.

6          THE COURT:  You're going to have to speak up.  The

7    court reporter has to hear it.

8          MR. GIBSON:  AAIT and Secure Cloud will maintain

9    internet connectivity for all platforms offshore during the

10   lifecycle of this agreement.  The corporate systems of W&T,

11   however, will be primarily managed by W&T, however, AAIT has

12   agreed to support them in their efforts if they do request at

13   the same level that they're currently supporting those systems.

14          We have agreed if there is a dispute about the

15   ownership of a piece of hardware, then we will submit any such

16   dispute to former Judge Gregg Costa as our primary selection.

17   If Judge Costa is unable or unwilling to take the appointment,

18   our backup is former Judge Halbach.  We will empower

19   Judge Costa or Judge Halbach --

20          THE COURT:  Halbach will probably be cheaper.

21          MR. GIBSON:  Judge, whichever judge is ultimately the

22   referee of that dispute, all fees will be paid by W&T unless

23   that judge makes a determination that AAIT or Secure Cloud has

24   taken an unreasonable position as to ownership of any

25   particular piece of hardware -- any issue that's in dispute, I

1    suppose, for which he will have jurisdiction to determine.

2         THE COURT:  It's easier if you do it that way.

3         MR. GIBSON:  Yes.  We've given this guidance that we've

4    agreed to and it was quite hard-negotiated actually.  Here's

5    the guidance that we will have for either Judge Costa or

6    Judge Halbach.

7              We ask our judge to determine that the intent of

8    the parties is to require anything reasonably needed to secure

9    an orderly transition so long as such action respects the

10   parties' property and contractual rights without limitation of

11   the overall purpose.

12             In addition, AAIT will appoint a single senior

13   network engineer to be the point person for all interactions

14   with W&T during the lifecycle of the contract.

15             AAIT and Secure Cloud requests $25,000 per day

16   for the performance of this duty across all 120 offshore

17   platforms including the corporate.

18             Oh, there's a couple more before I get there.

19   No, that's right.

20             So AAIT requests $25,000 per day for the

21   performance of all aspects of this contract.

22             And have I left -- other than price, have I left

23   any terms off?

24        MR. HITTNER:  Well, you just gave him your price.

25        MR. GIBSON:  Right.  I know.

1      MR. CURTH:  It's not the singular cage.  It's multiple
2  cages.
3      MR. GIBSON:  The data center access to the cage, as I
4  said, for the single expert of the plaintiffs, there are two
5  locations and he will be given access upon notice and upon a
6  plan presented to AAIT for both cages.
7           Payment will be 15 days in advance.
8      MR. CURTH:  Not 30.
9      MR. HITTNER:  I do want to be clear we're not agreed on
10  that $25,000 a day, but everything else is as it's represented.
11           $25,000 a day represents a 250 --
12      THE COURT:  Okay.  Everybody's told me that three or
13  four times today; so see if you can do better while they're
14  doing the rest of it.
15      MR. HITTNER:  Would you like to know where we are?
16      THE COURT:  I thought you had agreed to that --
17      MR. HITTNER:  No, sir.
18      THE COURT:  -- and then you had to work out --
19      MR. HITTNER:  We agreed to all the terms, not as to the
20  price that he just threw out.
21      THE COURT:  Okay.  That's what it says.
22      MR. GIBSON:  So the price offered by the plaintiffs is
23  $13,000 a day.  We have been unable to cross the bridge between
24  those two.  We consider that number low because at open court
25  they had already offered 500,000 a month, which is 16,000 a

1   day; and so when we went into the room, the price came down.

2           THE COURT:  Just because somebody is --

3           MR. CURTH:  Judge, he's misconstruing that.  That was

4   based on paying -- I'm sure the record reflects it was based on

5   the assumption that we paid between 350,000 and 400,000 a

6   month, so that's not correct.

7           THE COURT:  Well, that's why you work out a per-bottle

8   deal.

9           MR. CURTH:  We can go back and figure this out.

10          MR. GIBSON:  So other than the price, the parties are

11  agreed; and so I do think there is wisdom in taking -- if we

12  can have 24 hours to see -- talking to our principals, talking

13  to their principals, to see if we can cross that bridge.

14          THE COURT:  I do think it's good to sleep on it.  I

15  think you'll sleep better than you did last night.

16          MR. HITTNER:  120 days on the injunction.

17          MR. GIBSON:  The maximum time frame.  So long as

18  they're paying the daily rate that's being requested, then they

19  may continue the seven-day increments for a total of 120 days

20  of injunction.

21          THE COURT:  I'm going to have a peculiar injunction,

22  which it is carry that out.  And you say I have 120 days?

23          MR. HITTNER:  120 days is what we agreed to as long as

24  we are paying the daily rate, whatever that daily rate

25  eventually we agree to.

1          THE COURT:  All right.  Just get it to me clearly,

2     please.  I don't want to -- I'm not interested in the

3     injunction.  I'm interested in the productivity of you all in

4     finding out the easiest way to get this done.

5               Next year y'all will be in here arguing about

6     they made 18 billion more than we did -- well, it was actually

7     18.1 on our part and 18 on their part.

8               I don't know.  But that's a solution.  It's not

9     a -- what was his name?  He was a prizefighter that eventually

10    lost his mind.

11          MR. CURTH:  Ali.

12          THE COURT:  Yeah, Ali.  So I was having a trial, it was

13    a criminal trial of a friend of Ali's and I had the jury

14    sitting over there where they're supposed to and all of a

15    sudden I noticed that the galleys had filled up.  Where there

16    had been almost nobody, like now, all of the sudden lots of

17    whispering going on.  So I looked and between two nurses was

18    Muhammad Ali.

19               So I wrote a note to the juror and said, "The man

20    between the two ladies in white dresses on the first row is

21    Muhammad Ali.  Nothing interesting is going to happen.  Pass it

22    on."

23               Everybody quit watching.  He was convicted of

24    draft evasion in this building.  He was later acquitted when

25    the Supreme Court said they were all too vague.  I don't

1    understand why they couldn't tell it at the time.

2              All right.  So do you want to come by tomorrow

3    late?

4              MR. GIBSON:  I think that would be wise.  Does the

5    Court have time for us tomorrow afternoon?

6              THE COURT:  The afternoon is zero to 3 roughly.  I've

7    got a hearing in here, and I sure would like to not necessarily

8    be here.  I've seen the dawn, you know.  I might like to see

9    midday, but I will be here probably between 8 and 9.  Do you

10   want to be here earlier?

11             MR. HITTNER:  No.  I was under the impression we were

12   coming here in the afternoon.  Sounds to me like you were

13   booked from noon to 3:00.  Do you want us here at 3 o'clock?

14             MR. GIBSON:  Because that would give us time to talk to

15   the decision-makers.

16             THE COURT:  All right.  That's just one of my events.

17   I'll tell you what it is.  It's somebody being sworn into the

18   bar, and I'm not as happy for her as I am happy for her

19   parents -- not that all children are deadweight.

20             MR. HITTNER:  I'll let my father --

21             THE COURT:  I'm not going to ask him because I like you

22   too much.

23             MR. HITTNER:  What time would you like us back here,

24   Your Honor?

25             THE COURT:  Let's make it 3:30 just to give me a little

1    more room to see the happy people.

2         MR. GIBSON:  If we can reach an agreement, can we

3    submit it to pass the hearing?

4         THE COURT:  If it's written.  You know, you ought to

5    seal it with something official like some of his blood.  That's

6    what knights did.  They didn't hack it with an ax, they just

7    nicked him a little bit.

8         MR. GIBSON:  Written in blood.  Got it.

9         MR. HITTNER:  Hittner's blood.

10        THE COURT:  All right.  So the ultimate limit of

11   extension is, let's say, 4 o'clock.

12             All right.  Thank you, gentlemen.

13        MR. GIBSON:  Thank you.

14        MR. HITTNER:  Thank you.

15        THE COURT:  And unspecified relationship entity, thank

16   you.

17             (The proceedings were adjourned.)

18                       * * * *

19                  REPORTER'S CERTIFICATE

20             I, David S. Smith, CSR, RPR, CRR, Official
     Court Reporter, United States District Court, Southern District
21   of Texas, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
22   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

23

24                       ___/s/ David S. Smith___
                         Official Court Reporter

25